**ANATEUS LINEAL 1948, INC.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. F–72–C–10.

United States District Court,
W. D. Arkansas,
Fayetteville Division.

Nov. 9, 1973.

F. H. Martin, Jr., of Ball, Gallman & Martin, Fayetteville, Ark., for plaintiff.

Eugene G. Sayre, Atty., Dept. of Justice, Tax Div., Dallas, Tex., for defendant.

## OPINION

JOHN E. MILLER, Senior District Judge.

In the complaint of plaintiff filed February 17, 1972, it is alleged that during the calendar years 1964, 1965, and

1966 it was an organization described in § 501(c)(3) of the Internal Revenue Code and exempt from the payment of federal income tax; that it executed and filed its returns on IRS Forms 990–A for said calendar years within the time required by law; that the defendant through the Internal Revenue Service erroneously and improperly assessed taxes against the plaintiff by asserting that plaintiff had unrelated business taxable income for the years ending and in the amounts as follows:

| | |
|---|---|
| 1964 | $19,928.33 |
| 1965 | 22,961.33 |
| 1966 | 28,017.52 |

The additional tax and interest assessed for the three years total $19,499.44, which were paid by plaintiff, and on July 26, 1971, plaintiff filed its claims for refund for taxes and interest assessed against it for the income taxes for the three years involved. The plaintiff prays for a judgment against the defendant for said sum of $19,499.44, with interest from July 20, 1971.

The answer of the defendant was filed April 21, 1972, in which it denied that any interest or taxes were erroneously and improperly assessed and denied that plaintiff is entitled to recover as alleged in the complaint.

The case was tried to the court on May 21, 1973, at which time Drs. Mae B. and Anderson Nettleship, husband and wife, testified. A stipulation of facts was filed along with joint exhibits 1–9, plaintiff's exhibits 10–23, and defendant's exhibits 10, 11 and 12.

Briefly stated, it was agreed in the stipulation that the jurisdiction of the court exists under 28 U.S.C., § 1346(a)(1); that plaintiff is a corporation organized and existing under the Arkansas Nonprofit Corporation Act, and has its main office in Fayetteville, Arkansas.

That on March 23, 1961, the Internal Revenue Service issued its letter of determination (Ex. A to complaint) that the plaintiff qualified as an organization exempt from payment of federal income tax pursuant to § 501(c)(3) of the Internal Revenue Code as an organization organized and operated exclusively for educational and scientific purposes. That plaintiff continued as an exempt organization during the three years involved herein.

That plaintiff timely and properly filed its Return of Organization Exempt from Tax, IRS Form 990–A, for the calendar years involved. Copies of the returns for the years were attached as Exhibits 2, 3 and 4 to the stipulation.

That on January 14, 1971, the defendant served notice upon plaintiff of deficiencies in federal income taxes for the years heretofore stated, which the plaintiff paid on July 27, 1971. That the deficiencies were based upon the assertion that plaintiff had unrelated taxable income for the years 1964, 1965 and 1966 in the amounts heretofore stated.

That the plaintiff properly and timely filed its claims for refund of such taxes and interest, and upon denial of the claims filed this suit for refund after the expiration of more than six months from the date of filing said claims for refund. Copies of said claims are attached as Exhibits 5, 6 and 7 to the stipulation.

A true and correct copy of the Amended Articles of Association was attached to the stipulation as joint Exhibit 8.

Also attached to the stipulation as joint Exhibit 9 is a true and correct copy of the application for exempt status filed with the IRS on March 6, 1961. The application was granted March 23, 1961; (joint Ex. 1) and, inter alia, states:

"Based upon the evidence submitted, it is held that you are exempt from federal income tax as an organization described in § 501(c)(3) of the Internal Revenue Code, as it is shown that you are organized and operated exclusively for the purpose shown above."

Paragraphs 12, 13, 14 and 15 of the stipulation are as follows:

"12. That the issue for determination herein is whether the plaintiff had income from an unrelated trade or business as defined by Section 513 of the Internal Revenue Code.

"13. The contentions of the parties are as follows:

(a) The defendant contends that all or a portion of the plaintiff's income was derived from an unrelated trade or business as defined by Section 513 of the Internal Revenue Code and that such income is subject to tax under Section 511 of the Internal Revenue Code.

(b) The plaintiff contends that it did not carry on any unrelated trade or business as defined by Section 513 of the Internal Revenue Code and that none of its income is subject to the tax imposed by Section 511 of the Internal Revenue Code.

"14. Any additional exhibits to be offered as evidence in this cause will be exchanged by the parties prior to trial, and names of witnesses who may be called will be exchanged by the parties prior to trial.

"15. That there was no official connection between the plaintiff and the University of Arkansas during the years in suit."

In defendant's brief it is stated that the question presented is "whether amounts received by plaintiff, an exempt organization, from certain hospitals, physicians and individuals, in payment for pathology testing services, constitute unrelated business taxable income to the plaintiff." It argues that the activities of plaintiff in providing pathology services for four hospitals and numerous private physicians do not constitute fundamental research so as to qualify it for the exemption from tax on unrelated business income.

It further argues that the income received by plaintiff constitutes unrelated business taxable income because the principal purpose of the activity that generated the income was not to further the purpose for which the organization had originally been granted tax exempt status.

The plaintiff contends that it did not carry on any unrelated trade or business and that none of its income is subject to the tax imposed by § 511 of the Internal Revenue Code.

In view of the questions presented and the contentions of the parties, the court will first set forth the applicable law, and then will state the applicable facts as found by the court from a consideration of the stipulation, exhibits and ore tenus testimony.

*The Applicable Law*

Section 501, 26 U.S.C., of the Internal Revenue Code provides:

"(a) Exemption from taxation.— An organization described in subsection (c) or (d) of section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

\*    \*    \*    \*    \*    \*

(c) List of exempt organizations. —The following organizations are referred to in subsection (a):

\*    \*    \*    \*    \*    \*

"(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inure to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

Section 511, 26 U.S.C., of the Internal Revenue Code, provides:

"(a) Charitable, etc., Organizations Taxable at Corporation Rates.—

"(1) Imposition of tax.—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a normal tax and a surtax computed as provided in section 11. In making such computation for purposes of this section, the term 'taxable income' as used in section 11 shall be read as 'unrelated business taxable income'."

Section 512, 26 U.S.C., IRC 1954, defines the term "unrelated business taxable income" as follows:

"(a) Definition.—The term 'unrelated business taxable income' means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) * * *."

Section 513, 26 U.S.C., IRC 1954, provides:

"(a) General rule.—The term 'unrelated trade or business' means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * *."

Treasury Regulation, § 1.513–1(a)(2) (prior to 1967 amendment) provides:

"The income of an exempt organization is subject to the tax on unrelated business income only if two conditions are present with respect to such income. The first condition is that the income must be from a trade or business which is regularly carried on by the organization. The second condition is that the trade or business must not be substantially related (aside from the need of the organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose of function constituting the basis for its exemption * * *. Whether or not an organization is subject to the tax imposed by Section 511 shall be determined by the application of these tests to the particular circumstances involved in each individual case. * * *"

In subparagraph 4 the Regulation provides:

"Ordinarily, a trade or business is substantially related to the activities for which an organization is granted exemption if the principal purpose of such trade or business is to further (other than through the production of income) the purpose for which the organization is granted exemption. In the usual case the nature and size of the trade or business must be compared with the nature and extent of the activities for which the organization is granted exemption in order to determine whether the principal purpose of such trade or business is to further (other than through the production of income) the purpose for which the organization is granted exemption. * * * In some cases the business may be substantially related because it is a necessary part of the exempt activity. For example, in the case of any organization described in Section 501(c)(3) and engaged in the rehabilitation of handicapped persons, the business of selling articles made by such persons as a part of their rehabilitation training would not be considered an unrelated business since such business is a necessary part of the rehabilitation program."

There is no dispute but that the plaintiff was and still is operating a trade or business and that such trade or business is regularly carried on. Thus, the question to be determined is whether the trade or business is substantially related to the purposes for which the plaintiff was granted exemption. Those purposes

are clearly set forth in the Articles of Association as follows:

"The objects and purposes for which this Association is exclusively organized are:

"(a) To promote, participate or engage in any and all activities necessary and proper for the promotion of literary, scientific and educational purposes within the meaning of Section 501(a)(3) of the Internal Revenue Code of 1954.

"(b) To receive contributions and pay the same, together with any other income of the Association, over to organizations which are described in Section 501(c)(3) and exempt from taxation under Section 501(a) of the Internal Revenue Code of 1954.

"(c) To acquire, purchase, own, hold, operate, develop, lease, mortgage, pledge, exchange, sell, transfer or otherwise invest, trade or deal in, in any manner, in personal and real property for the purpose of carrying out the objects for which this association is created.

"(d) To have and to exercise all the powers now or hereafter conferred by the laws of the State of Arkansas upon associations organized under the laws under which this association is organized, and any and all acts amendatory thereof and supplemental thereto, limited only by the requirements of Sections 501(a) and 501(a)(3) of the Internal Revenue Code of 1954 for the establishment of a literary, scientific and educational organization thereunder.

\* \* \* \* \* \*

"(f) To do all and everything necessary and proper for the accomplishment of the objects enumerated in these Articles, or any amendment thereto, or necessary or incidental to the protection and benefit of this association; and, in general, to carry on any lawful object or purpose necessary or incidental to the attainment of the objects and purposes of this association whether or not such object and

purpose is similar in nature to the objects and purposes set forth in these Articles or any amendment thereof."

For many years Congress has exempted certain corporations from taxation. The exemption to corporations organized and operated exclusively for charitable, religious, educational or other purposes carried on for charity is granted because of the benefit the public obtains from their activities.

H.R.Rep. No. 1860, 75th Cong., 3d Sess., (1937) states: "The Government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from public funds, and by the benefits resulting from the promotion of the general welfare." Christian Echoes Nat. Ministry, Inc., v. United States, (10 Cir. 1972) 470 F.2d 849, 853, 854.

An annotation entitled, "When is corporation, community chest, fund, foundation, or club 'organized and operated exclusively' for charitable or other exempt purposes under Internal Revenue Code," appears in 69 A.L.R.2d pp. 871–946. In this annotation practically every question involved in whether or not the corporation or other organization is exempt is considered. At page 879 the learned author states:

"§ 3. Summary.

"The majority view is that the phrase 'organized and operated exclusively' is entitled to a liberal construction in favor of the taxpayer.

"The word 'organized' means 'created to perform,' or 'established to promote'; as applied to corporations, the better view is that 'organized' is not limited to 'incorporated.'

"The charter or other instrument by which an organization comes into being is not conclusive on the issue of the purposes for which it is organized, and the court may consider extrinsic evidence on the issue. And the fact that an organization was incorporated under the general business corporation laws, rather than under the laws relat-

ing to charitable, educational, or non-business corporations does not preclude a finding that it was organized exclusively for exempt purposes. The purpose for which a corporation has been organized is a question of fact, to be determined from all the evidence, including statements in the charter and evidence concerning the circumstances surrounding its organization, the purposes and intentions of the incorporators, and the activities of the corporation and of any predecessor organization."

At page 881 it is stated:

"A statute which exempts from taxation any corporation which is organized and operated exclusively for religious, charitable, scientific, or educational purposes recognizes that a corporation may be organized and operated exclusively for an exempt purpose and yet have a net income. Therefore, the fact that a corporation has a net income does not show that it has not been organized and operated exclusively for exempt purposes. It is accordingly held that if a questioned activity of an exempt organization is not a substantial independent purpose, and is incidental to the exempt activities, the fact that the questioned activity results in a profit does not establish that the taxpayer was not organized and operated exclusively for exempt purposes even though a similar activity of an individual might be considered a trade or business."

Following the opinion of the Supreme Court in Trinidad v. Sagrada Orden de Predicadores, (1924) 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458, the courts generally held that the test of exemption or the question of whether an organization was operating exclusively for exempt purposes, where it had income from commercial sources, was the destination of the income rather than its source. See, § 26, p. 931 of annotation, supra.

In Boman v. Commissioner of Internal Revenue, (8 Cir. 1957) 240 F.2d 767, at page 771, the court, after citing and discussing many decisions, said:

" '* * * These cases hold, along with others, that the exclusive purpose required by the statute is met when the only object of the organization involved originally was and continues to be religious, scientific, charitable or educational, without regard to the method of procuring the funds necessary to effectuate the objective.'

"We agree with the reasoning of the cases just cited, supporting the position that the exclusive purpose required by the exemption statute is met when the destination of the corporate assets and income is recognized charities. It is entirely clear that all assets of the Foundation, including principal and income, are irrevocably pledged to charitable uses."

The Revenue Act of 1950 inaugurated a policy of taxing the "unrelated business income" of an exempt organization, the applicable provisions of which are now found in §§ 511 to 514 of the Internal Revenue Code of 1954. At page 933 of the annotation heretofore referred to, the learned author states:

"The extensive definitions and qualifications made in § 512 of the Internal Revenue Code of 1954 make it clear that even though the operation of a business is a substantial activity, the organization does not lose its exemption merely because of the business activity, provided that its income is devoted to exempt purposes. Thus, it adopts the 'destination of income' test with respect to organizations other than feeder corporations. And the organization meets the test of being organized and operated exclusively for exempt purposes, even though it operates a business, where the income must be devoted to exempt purposes. In this connection, see § 501(b) of the Internal Revenue Code of 1954, which provides: 'An organization exempt from taxation under subsection (a)

shall be subject to tax to the extent provided in part II of this subchapter (relating to tax on unrelated income), but, notwithstanding part II, shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes.' "

## Facts

As heretofore stated, the amended Articles of Association of Anateus Lineal 1948, Inc., (ANL) were granted on February 11, 1961, and the purpose of the Association was to promote, participate or engage in all activities necessary and proper for the promotion of literary, scientific and educational purposes within the meaning of § 501(c)(3) of the Internal Revenue Code of 1954. They provide that the funds, income and contributions, assets or property of the Association do not inure to the benefit of any private person except reasonable compensation may be paid to the officers, agents and employees of the Association for services rendered, and that none of the funds of the Association can be used in any way whatsoever for the purpose of influencing or attempting to influence legislation or to assist in any way whatever any political candidate for public office.

ANL is governed by a Board composed of members of the Association that has general control of its managements, assets and finances through a Board of Governors. The Board of Governors was established by the members and it has directed the affairs of the organization pursuant to the Articles of Association. The Board is composed of business, religious and professional persons in the Fayetteville, Arkansas, area. No member of the Board of Governors has ever received compensation for services rendered the organization.

For several years prior to the amendment of the Articles, Dr. Anderson Nettleship and Dr. Mae Nettleship, husband and wife, were living in Little Rock, Arkansas, and engaged in their profession.

They are both graduate pathologists, having graduated from Johns Hopkins University in Baltimore and later did intern work in various leading hospitals. The husband was the Chief of the laboratory services at the VA Hospital in Little Rock and Professor and Chairman of the Department of Pathology.

In 1958 Dr. Anderson Nettleship left his position with the Pathology Department of the University of Arkansas Medical Center in Little Rock, and he and his wife moved to Fayetteville. At that time he took a position as Staff Pathologist with the VA Hospital at Fayetteville. Dr. Mae Nettleship became the Director of a predecessor organization in 1959, prior to the issuance of the present Articles of Association.

The Nettleships constructed a small laboratory in their home, and Dr. Mae Nettleship became Director of the ANL Laboratory and began to serve as Staff Pathologist for the Boone County Hospital at Harrison, Arkansas.

Being the only pathologist with offices in Fayetteville, Dr. Mae Nettleship soon entered into similar contracts as Staff Pathologist for Washington General Hospital, Fayetteville; Fayetteville City Hospital, Fayetteville; and Siloam Springs Memorial Hospital, Siloam Springs, Arkansas. In the case of the contract involving Fayetteville City Hospital, Dr. Mae Nettleship replaced Dr. A. S. Koenig, a physician engaged in the private practice of pathology for profit in Fort Smith, Arkansas.

Under all of the above mentioned contracts, Dr. Mae Nettleship's duties and responsibilities and her remuneration for services rendered were approximately the same. She was to be in charge of the various hospitals' medical laboratories, direct the hospitals' laboratory personnel, serve on the hospital medical staff, perform the hospitals' autopsies, and process the specimens and tissues in either the hospitals' laboratories or at the ANL laboratory. In exchange for rendering the services, she was to receive a fixed percentage of the charge

made to the patient for the laboratory work. These charges were set on the same basis as those charged by a private practitioner, and in fact the medical profession would have considered her unethical if she had performed them without charge.

Pathology is that branch of medicine which treats of the essential nature of disease, especially of the structural and functional changes in tissues and organs of the body which cause or are caused by disease.

The primary activities carried on by ANL have been medical research and the teaching and training of persons in the medical profession. It furnishes pathology services to area hospitals and physicians. The annual reports of the Director, Dr. Mae Nettleship, indicate the various topics which were the subject of research during the years in question. All this research can be carried on only by use of specimens received by the plaintiff from the various hospitals and physicians with whom it has contracted to provide pathology services. The specimens are composed of human tissue, blood, urine, etc. All such specimens are retained by the plaintiff in its laboratory, either by use of slides, freeze dry techniques or by placing the specimen in formaldehyde solution. They are all classified and indexed according to the type of disease involved. Studies are then performed and if definite conclusions are received, the information is made available to the profession by publication in trade journals and through seminars held by the Association for members of the medical profession.

Plaintiff's Exhibits 22 and 23 reveal the qualifications of Dr. Anderson Nettleship, schools attended, degrees, experience, societies, etc., and a list of 58 publications written by him beginning in 1932 and extending through 1967 that were published in various trade journals and quoted in various texts and reference works.

Plaintiff's Exhibit 17 is a schedule prepared by Dr. Mae Nettleship from the plaintiff's library containing information on 100 consecutive cases of chronic gallbladder diseases.

Plaintiff's Exhibit 18 is a schedule prepared by Dr. Mae Nettleship reflecting information on breast cancer cases for the period of 1959 through 1971.

Exhibit 19 concerns 48 cases and results relating to blood transfusions, and Exhibit 20 is a schedule of 3 cases relating to Reye's syndrome.

Since her association with the hospitals, she has instituted many things before places of comparable size have been able to do so. The organization has been doing chromosome studies which has become a common procedure since the institution in the hospitals in the Fayetteville area by Dr. Mae Nettleship. A chromosome is defined as "one of several small dark-staining and more or less rod shaped bodies which appear in the nucleus of a cell at the time of cell division. They contain genes or hereditary factors and are constant in number in each species." The normal number in a man is 46 with 22 pairs of autosomes and two sex chromosomes. Many chromosomal aberrations may occur, some of them being typically associated with various abnormalities. Dr. Mae Nettleship has also established a virology system in the hospitals that the Association is serving. Virology is that branch of microbiology which is concerned with virus and viral diseases.

The other primary activity of the plaintiff has been and is the training of persons interested in the medical profession. These persons have ranged from high school students to persons who are studying to become certified in a special field of medicine. A number of interested high school students are chosen to attend the facilities of the Association on a daily basis. Formal lectures are provided for these students and they observe the laboratory work and research activities carried on by the Director and other employed medical technicians. The technicians are required to teach along with their work, and no technician

is employed who does not like to teach for the reason that the teaching is an equal responsibility for doing the tests. Some tests are done in the hospital laboratory. Others in plaintiff's laboratory. Usually the routine tests, such as urinalysis, CBC's and things of that nature are done in the hospital laboratories. All of the special procedures are done in ANL with the exception of frozen section studies and autopsies. The group that is classified as student fellows do not do the tests except with a medical technologist. In order to give those people a chance to gain experience with interesting material and learn to do the test, they are required to work on it in plaintiff's situation. In 1964 plaintiff had five student fellows. In 1965 plaintiff made contact with the John Brown University and that year had eleven student fellows. In 1966 was the first time plaintiff had gotten really into its formal summer programs. This was necessary because of applications of premedical students at the University who desired to avoid being part time through their regular school year. During that summer plaintiff had 18 student fellows, and then began to try to formalize training for them, particularly in the terms of pathology. Then is when those students really began to use plaintiff's files for study. Plaintiff would take some of its cases of pernicious anemia, cases of carcinoma of the stomach or other diseases and conduct some formal lectures instead of just a conference which were quite often but nearly always informal. In 1967 was the first time plaintiff gave a certificate because that was when its first medical technologist graduated from its accredited medical technology school. The fellow students were paid $50 every two weeks to help support them in their school work. An application form was developed and the applicant was always interviewed in order to enable the Director to weigh various factors before accepting him as a fellow student. After fully discussing all matters of importance and the background of the student, the Director and Dr. Anderson Nettleship made the choice. Of course, during all of this time the facilities were made available to any premedical college student who was free to observe the performing of autopsies and all other work performed under the supervision of the Director.

### Conclusions

■■ The defendant in its brief attempts to make the claims of plaintiff fall on a distinction between applied research and basic research. This argument ignores all the other operations of the plaintiff as established by the evidence. Defendant has stipulated that ANL continues to be an exempt organization within the meaning of § 501(c)(3) of the Internal Revenue Code of 1954. See Treasury Regulation 1.-501(c)(3)–1(c)(1). The research carried on by plaintiff is but one of the basic purposes for which it was organized. In addition, the plaintiff has trained high school, premedical and medical students, and in 1966 began a course of study for the training of medical technicians. Whether the gifts of money made by plaintiff to the medical students be classified as scholarship, stipend or grant is immaterial. The point is that such gifts are simply one or more of the exempt purposes for which the plaintiff was founded and for which it is operated. The defendant contends that the fact that the salaries paid by plaintiff range from 5 to 8 times the amount distributed by plaintiff for scholarships is significant. The plaintiff's employees were and are selected largely upon their ability to teach and their training in research activities. Had the plaintiff been operating a commercial laboratory, the salaries and other expenses would have been much lower. It was necessary that the plaintiff hire better qualified and more employees to carry out the exempt functions of the plaintiff.

■ Defendant also contends that the testimony establishes that "the pathology testing business of ANL rather than

its fundamental research or medical educational program" was the principal purpose for the entity operated.

Medical education and research are unique in that the persons involved in such pursuits must ultimately have human specimens with which to work. Much of the research and training given by plaintiff is aimed at learning and teaching diagnostic techniques, and in order to do this, human tissue and specimens must be available with which to perform research and to carry on the teaching.

The defendant further asserts that the fact that ANL may have expanded educational facilities in the years subsequent to those in suit should not have any effect upon the decision of the claim of the plaintiff in suit. Although the plaintiff was originally incorporated in 1948 while the Nettleships lived in Little Rock, under the facts the type of operations now carried on by the plaintiff actually had their beginning in 1960 at Fayetteville. It naturally required some time to establish the facilities for carrying out the purposes of the plaintiff. There is no way to properly train medical technicians other than having them observe the work with the problems they are to see in actual practice. The fee-producing activity is not only substantially related but is necessary to carry out the teaching of students. Without question, the profits made by the plaintiff were plowed back into the expansion of ANL's facilities and equipment. More sophisticated equipment was necessary and was purchased by ANL. In fact, there is little comparison between the laboratory of the plaintiff and the ordinary commercial laboratories and the work done in them. The profits realized by the plaintiff were made possible by the dedication of the Director and her husband Doctor. It seems unnecessary to further consider the differences between the operation of a commercial laboratory and the plaintiff's operation.

■ Congress has not attempted by the enactment of § 511 of the Internal Revenue Code of 1954 to tax all business income of exempt organizations. The regulations clearly indicate that an exempt organization may carry on a business or activity which competes with other businesses without subjecting itself to taxation so long as the business is substantially related to the exempt purpose of the organization. In fact, the income producing activities are absolutely necessary to the carrying out of the exempt purposes. In most cases where the Government has attempted to impose a tax under § 511, it has challenged a particular type of transaction or one particular activity. In this case the facts as established by the evidence and found by the court conclusively show that all of the income produced and received by plaintiff is substantially related to its exempt purposes.

Therefore, plaintiff is entitled to recover the full amount as alleged in its complaint, and judgment is being entered today in favor of plaintiff, Anateus Lineal 1948, Inc., for $19,499.44, with interest at six percent per annum from July 27, 1971, and its costs expended.