**LOUISIANA CREDIT UNION LEAGUE**

v.

**UNITED STATES of America**

**Civ. A. No. 78–3234.**

United States District Court,
E. D. Louisiana.

Oct. 31, 1980.

Joseph A. Barreca, New Orleans, La., William J. Lehrfeld, Washington, D.C., for Louisiana Credit Union League.

Jean E. Kilpatrick, Dept. of Justice, Washington, D.C., for the United States.

CHARLES SCHWARTZ, Jr., District Judge.

Section 511 of the Internal Revenue Code imposes a tax on income received by an otherwise tax-exempt organization when that income arises from the organization's involvement in any business activity which is not substantially related to its tax-exempt purpose. I.R.C. §§ 511, 513 (cited hereinafter by section number only). The need of the organization for funds to further its cause does not qualify as such a substantial relation. § 513(a). At issue here is the status and consequent taxability of certain income received by plaintiff Louisiana Credit Union League (the League).

The procedural history of this case, now before the Court on the League's motion for summary judgment and the motion of the Internal Revenue Service (the Service) for partial summary judgment,[1] has been unusual and complicated. On October 3, 1978, the League filed suit under sections 1340 and 1346(a)(1) of Title 28 of the United States Code to recover income tax payments which, it alleged, the Service had wrongfully assessed and collected under the provisions governing the unrelated business income of tax-exempt organizations. The amount which it at that time paid and for which it sought refund was $33.40.

On June 21, 1979, however, the Service issued a notice of a deficiency of $23,717.48 in the tax paid by the League for the year ending March 31, 1977. The instant action was thereupon stayed, in accordance with section 7422(e), for the ninety days allowed the League to file a petition with the Tax Court and for sixty days thereafter. The League opted not to bring action in the Tax Court, however; this Court thereby retained jurisdiction.

The League paid the assessed $23,717.48, plus interest (a total of $27,124.94), for the year ending March 31, 1977, and filed for a refund, which request was denied. In the meantime, the Service issued notices of deficiencies of $20,738.64 (and interest of $4,449.09) for the year ending March 31, 1975, and for $19,797.88 (with interest of $3,837.72) for the year ending March 31, 1976. The League paid these amounts and filed for refunds; the Service denied these claims also. The League thereupon filed an amended complaint asking for repayment of these allegedly wrongfully collected amounts totaling $77,092.67, plus interest.

The League engages in three separate revenue-producing activities, discussed in more detail below, which the Service has found to be trades or businesses unrelated to the League's purpose of fostering the credit union movement in Louisiana. Briefly stated, these sources of income are rebates received upon the writing of new and renewal insurance policies by a company whose coverage plans the League endorses, a five percent commission on delinquent accounts collected by an agency whose services the League endorses to its member credit unions, and revenue from an electronic data processing system which the League makes available to members.

Since April 1, 1972, the League has contractually agreed to give active support and official endorsement solely to insurance policies sold by the CUNA Mutual Insurance Society and the CUMIS Insurance Society, Inc.[2] The League has encouraged its member credit unions to avail themselves of all the various types of coverage the CUNA group offers and has helped new credit unions establish ties with the company. In addition, the League has printed articles discussing available coverage, has included CUNA literature in its mailings, and has cooperated in providing data processing services for insurance billing needs. In return, the League has received commissions usually of 5% or 7½% on initial insurance purchases and 2½% or 5% on renewals.[3]

---

1. The Court heard oral argument on June 11, 1980, at which time it took the motions under submission.

2. CUNA is owned by its policyholders; it in turn owns 98% of CUMIS.

3. The League receives 5% commissions on both initial sales and renewals with respect to CUNA group life and individual life policies. It receives a 7½% commission on CUNA credit disability insurance, on which there are no renewals. The League receives an initial com-

While CUNA/CUMIS is in essence a mutual company marketing only to credit unions, there are at least two other companies which market solely to credit unions. Large general insurance companies such as Prudential, Metropolitan, and John Hancock compete for the credit union market as well.

In addition to its endorsement of insurance and the active assistance it renders to CUNA/CUMIS, the League has since June 22, 1973, been party to a contract with Central Adjustment Bureau, Inc. (CAB). Under its terms, the League endeavors to make its member credit unions aware of the collection services CAB offers; it does so through various sorts of promotion, including discussion in the League's publications and mention at credit union conferences as well as direct urging aimed at individual credit unions. For its efforts, the League receives five percent of the amounts collected on delinquent accounts.

Finally, the League in late 1974 contracted with Louisiana Computing Corporation (LCC) to obtain a new package of computer programs. Such software was jointly owned and received the exclusive endorsement of the League, which entered into data processing contracts with several member credit unions. The League trained union personnel and supplied all reports and report forms. Currently the League collects 27 cents per member for monthly processing, of which it pays 18 or 19 cents to LCC. The League does the accounting and collection work related to its LCC contract; contact between individual credit unions and LCC is rare. Field representatives of the League promote the data processing services.

As already noted, section 511 provides that tax-exempt organizations, such as the League, must pay tax on that portion of their income attributable to unrelated business activity; the Service has found the League's income arising from its insurance endorsements, collection services, and data processing contracts to be such income and has assessed tax accordingly.

"Unrelated business taxable income" is that derived "from any unrelated trade or business," which in turn is defined as being one

the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 . . . except that such term does not include any trade or business—

(1) in which substantially all the work in carrying on such trade or business is performed for the organization without compensation.

In resolving the issues presented by the cross-claims for summary judgment here, our inquiry must potentially consider several questions. These are:

1) Do any of the League's challenged activities constitute a "trade or business" within the meaning of section 513(c)?

2) If an activity is a trade or business is it "regularly carried on" within the meaning of section 512?

3) If the answer to both of the above questions is in the affirmative, is the activity in question one "substantially related" to the exercise of the League's tax-exempt function as defined in section 513(a)?

4) If there is no such substantial relation, is it the case that "substantially all the work in carrying on such trade or business is performed for the organization without compensation" as contemplated by section 513(a)(1)?

I. *Trade or Business?*

As to the first in this series of questions, "the term 'trade or business' includes any activity which is carried on for the production of income from the sale of goods or the

---

mission of 5% and renewal commissions of 2½% on Cumis bond, officers' and directors' liability, and "package of protection" policies.

On automobile insurance policies it receives a 1% commission on new policies and renewals.

performance of services." Section 513(c). Each of the three challenged League activities produces substantial income to the League as a result of services which the League performs. Its involvement in data processing and collection services as well as its promotion of the sale of certain insurance is detailed above.

The League cites *Oklahoma Cattlemen's Ass'n., Inc. v. United States*, 310 F.Supp. 320 (W.D.Okl.1969), and *San Antonio District Dental Society v. United States*, 340 F.Supp. 11 (W.D.Tex.1972), for the proposition that an exempt organization's involvement in a trade or business in which it exercises no control over the possible financial result of the endeavor but through which it receives income is insufficient to implicate section 501(b).

In the *Oklahoma Cattlemen's* case, an exempt organization sent out one letter to its members endorsing the policies of a certain insurance company and supplied that company with its membership roster. In the *San Antonio* case, dentists contracted with a bank to allow their patients to finance their dental bills; the Dental Society received five percent of the bill amounts, which it then held in reserve against possible defaults on accounts.

The League's activity with respect to insurance, collection, and data processing has been, as already outlined, considerably more extensive than the activity of the exempt organizations considered in the *Oklahoma Cattlemen's* and *San Antonio* cases. Therefore, even were the Court to recognize these as precedent, they would not control here in light of the facts of this case.

■ It is the conclusion of this Court, however, that the broad rule requiring active control over an activity in order for that activity to give rise to taxable income— which rule the League distills primarily from *Oklahoma Cattlemen's* and *San Antonio*—is an incorrectly decided one. The plain language of the statute, which directs that *any* performance of service giving rise to income be deemed a "trade or business," allows no other conclusion.[4] Section 513(c).

The League also argues, in support of the active control rule, that the Court must look to legislative intent to make its determination. At the time of the enactment of the tax on unrelated business income, exempt institutions such as New York University were operating such traditionally taxed enterprises as noodle factories but were required to pay no income tax on these operations. *See*, e. g., *C. F. Mueller Co. v. Commissioner*, 190 F.2d 120 (3d Cir. 1951).

Congress intended, the League suggests, primarily to prohibit tax-exempt organizations from taking unfair advantage of their exempt status by acquiring and operating enterprises in direct competition with private owners who would be comparatively disadvantaged by their obligation to pay income tax on earnings. *See* H.Rep. 2319, 81st Cong., 2d Sess., C.B. 1950–2, 380 at 409. *See also* Note, The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations, 81 Harv.L.Rev. 1280 (1968). The League argues that it does not compete and that its mere endorsement of certain products and services is, thus, far from being the sort of unrelated business income Congress intended to tax.

It cannot be gainsaid that a purpose, perhaps the primary purpose, of Congress in enacting the predecessor of section 511 was to eliminate that which it took to be the unfair advantage enjoyed by exempt institutions choosing to enter the competitive, traditionally private and liable-to-taxation world of the marketplace. Congress had other purposes for enacting the tax, how-

---

**4.** To the extent that it endorses the unfair competition rule, the Court finds *Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980), to be unpersuasive. The *Hope* court did, however, acknowledge that anti-competitiveness was not the *sole* criterion in determining. We would have reached the same result as the appellate court, albeit on the ground that the

greeting cards sent out by the home for the severely mentally handicapped are the sort of product expressly implicated by the Regulation providing that "when an organization sends out low–cost articles incidental to the solicitation of charitable contributions, the unrelated business income tax does not apply ...." 26 C.F.R. § 1.513–1(b).

ever; a major one of these was the production of revenue. President Truman's Message to Congress, 96 Cong.Rec. 769, 771 (1950); H.R.Rep.No.2319, 81st Cong., 2d Sess. (1950), *reprinted in* 1950–2 C.B. 380–81; S.Rep.No.2375, 81st Cong., 2d Sess. (1950), *reprinted in* 1950–2 C.B. 483, 484 and [1950] U.S.Code Cong.Serv. p. 3053. *See Clarence LaBelle Post No. 217, V.F.W. v. United States*, 580 F.2d 270 (8th Cir. 1978).[5] *See also* 26 C.F.R. § 1.513–1(b).

■ Even finding a primary Congressional intent to curb anti-competitiveness could not alter the plain language of the statute. In construing the meaning of a statute, a court must begin with the language of that statute itself. *Touche Ross v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). While literalism must be rejected if such reading of a statute would lead to an incongruous or absurd result, the actual language must be heeded if it is reasonably consistent with the purpose of an act. *United States v. Compos–Serrano*, 404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971); *In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978). If the statutory language is clear, it controls. *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 200–201 and 214, 96 S.Ct. 1375, 1384–1385 and 1391, 47 L.Ed.2d 668 (1976). Therefore, the first duty of a court in acknowledging legislative intent must be to effectuate the *express* purpose of Congress as revealed by the language of the statute. We bear in mind Judge Goldberg's admonition that statutory interpretation, while it may be an art, must not be artful. *United States v. Parker*, 376 F.2d 402 (5th Cir. 1967). The language of section 513(a), as set out above, dictates that *any* income derived from an unrelated trade or business be taxed. Congress has for thirty years had the option of creating a requirement of competition with taxable entities as a pre-

requisite for taxation on unrelated business income; it has not done so.[6]

■ With respect to the insurance endorsement in particular, the League argues that the payment it receives is in the nature of a rebate from a mutual company and thus is not taxable. It is true that "it is the essence of mutual insurance that the excess of premium over the actual cost as later ascertained be returned to the policyholder and that amount is not income in the hands of the insured." *Penn Mutual Life Insurance Co. v. Lederer*, 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698 (1920); *see* GCM 19798, C.B. XI–2, 58 (1932). However, the League receives the rebate more *instead of* than *for* the individual policyholders; it makes no *pro rata* distribution to individual policyholders. The case the League cites in support of its contention is inapposite. *New York State Association of Real Estate Boards Group Insurance Fund*, 54 T.C. 1325 (1970). There, the Association was actually a conduit through which funds were ultimately distributed to individuals in whose hands the money was nontaxable. In that circumstance, the Tax Court properly decided that the funds held only temporarily by the Association were not taxable to the Association. The fact that the League retains and spends the money it receives from the mutual insurance association, rather than distributing it to the individual policyholders, distinguishes the present case from *New York Association of Real Estate Boards* and from Rev.Rul. 64–258, C.B. 1964–2, 134, and dictates that this money be considered business-derived income in the League's hands.

■ Each of the League's three activities here at issue must, in sum, be considered a "trade or business" within the meaning of the Code.

---

**5.** Although new Section 513(f) legislatively overrides the decision in *LaBelle* by creating a special exemption for certain bingo games, the reasoning of that case continues to be sound.

**6.** Even if there were such a requirement, the League's active endorsement of insurance, involvement in debt collection, and participation in data processing services would likely involve it in the competitive marketplace more than sufficiently for the invocation of the tax.

## II. *Regularly Carried On?*

We proceed, then, to the issue of whether these endeavors are regularly carried on. The League acknowledges that it "facilitates that sale [of insurance] by recommending various programs to credit unions and credit union managers and endorses the various programs of the CUNA Insurance Group." Plaintiff's Brief at 18. With respect to data processing, the League "agrees to furnish the [participating] credit union with accounting and statistical reports" as to at least fifteen categories of information, "trains credit union employees in the conversion system and in the operation of an EDP system," and supplies "all report forms and standard input supplies required to produce reports." *Id.* at 28–29. As to the debt collection agreement, its counsel characterizes the League as an ongoing "middleman" between the individual credit unions which choose to avail themselves of the service and the collection agency. *Id.* at 38–41. All of these activities are ongoing.

The Treasury Regulations clarify the meaning of "regularly carried on" for purposes of the statute:

In determining whether trade or business for which a particular amount of gross income derives is "regularly carried on," within the meaning of section 512, regard must be had to the frequency and continuity with which the activities productive of income are conducted and the manner in which they are pursued.

26 C.F.R. § 1.513–1(c)(1).

■ The League has involved itself in insurance, collection, and data processing frequently and on an ongoing basis. It is thus clear, in light of both the denotative meaning of the statutory language and the elaboration of it in the Regulations, that the League's activity in each case has been regularly carried on.

## III. *Substantially Related?*

The Louisiana Credit Union League is a business league which qualifies for tax-exempt status under Section 501(c)(6).[7] Its tax-exempt purpose is "to assist in the organization and development of credit unions in the state of Louisiana to bring about greater participation by the citizens of the state of Louisiana in the activities of such credit unions by way of attention to personal thrift, money management, and the prudent use of credit." Plaintiff's Brief at 5.

■ Money is almost always useful and rarely is scorned, even by those tax-exempt organizations which officially have their eye fixed upon a presumably non-monetary world beyond this vale of tears.[8] The drafters of the unrelated business tax laws recognized this fundamental truth; they provided that the requirement of a substantial relation between the business activity and the exercise or performance of the organization's tax-exempt purpose would *not* include the relationship between the organization's altruistic work and its need for money to carry that work out. Section 513(a). Regulations require a causal relationship between the business activity and the exempt organization's purpose to support a finding of the substantial relationship contemplated by the statute. 26 C.F.R. § 1–513–1(d)(2) (1979). In this case, each of the three challenged activities of the League is related to the League's purpose primarily, if not (especially in the case of insurance and debt collection) entirely, by virtue of its bringing in money which helps the League operate. Such a relationship is statutorily insufficient to qualify as "substantial."

The League further argues, however, that each of the three activities at issue here is of intrinsic importance to the furtherance of the credit league movement. It

---

**7.** We note in passing that Professor Bittker has suggested that the theoretical justification for the tax-exempt status of business leagues generally is "rickety." B. Bittker and G. Rahdert, The Exemption of Nonprofit Organizations from Federal Income Taxation, 85 Yale L.J.

299, 357 (1976). That issue, of course, is one for the Congress and is not before the Court today.

**8.** Cf. A. Balk, God Is Rich, Harper's Magazine, Oct. 1967 at 69.

suggests that insurance endorsement has "contributed importantly to the initiation, growth and stability of credit unions in Louisiana," which is tantamount to having "contributed importantly to the exempt purpose" of the League. Plaintiff's Brief at 23. *King County Insurance Association v. Commissioner*, 37 B.T.A. 288 (1938), a case decided prior to the enactment of the unrelated income tax, holds that commission received by a trade association from sales of insurance, which income served to reduce members' dues, was nontaxable. While the League dues of the member credit unions may be reduced by the insurance rebates, those member unions have no choice in the matter: the League simply collects and keeps its rebate. Further, unlike the *King County* situation, in which members were all engaged in the insurance business and in which some public good flowed from the Association's taking over the writing of all "public business" policies, the connection between the furtherance of the credit league movement and the selling of insurance is at best tangential. It is certainly not, for statutory or any other purposes, substantial.

The League argues that its data processing function contributes importantly to the credit league movement because it makes such services available to new and small credit unions which could otherwise not avail themselves of this sort of technology. Credit unions sufficiently strong to support their own in-house processing systems generally do so. While the League's position is not without persuasiveness, the Court notes that regulations pertaining to Section 501(c)(6), under which the League's exemption arises, which regulations recently were approved by the Supreme Court, *National Muffler Dealers Ass'n. v. United States*, 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979), provide that a business league's exempt "activities should be directed to the improvement of business conditions of one

or more lines of business as distinguished from the performance of particular services for individual persons." 26 C.F.R. § 1.501(c)(6)–1.

There is no dispute that some but not all of the League's members take advantage of the data processing program; those credit unions pay according to the amount of use they make of the program. As Justice Reed, writing for the Court of Claims, noted, "When each member contributes in proportion to what he receives, it is a strong indication that the benefits received are not ... 'inherently group benefits.' " *Evanston–North Shore Board of Realtors v. United States*, 320 F.2d 375, 379 (Ct.Cl.1963); *see also Indiana Retail Hardware Ass'n. v. United States*, 366 F.2d 998 (Ct.Cl.1966). Because the money the League receives for its data processing activity is less for the benefit of the credit union movement than for the benefit of individual participating credit unions and of the League itself, to which the funds accrue, the relationship between data processing and the League's purpose may not be deemed a substantial one.[9]

Finally, the League argues that its involvement in debt collection protects the integrity of its members and should therefore be held to be "related." Again, however, the primary purpose of the whole enterprise is to make money for the League. Too, the members availing themselves of the collection assistance effectively contribute to this aspect of League income in proportion to the amount of collected overdue accounts they receive. Thus, as with the data processing services, only certain members receive benefits, and these are not inherently ones furthering the common interest of the entire League membership.

The League also argues that the income it derives from the collection service is exempt from taxation by virtue of section 512(b)(2), which provides that

---

**9.** Were it the case that the League furnished data processing services to every credit union in the state, the issue would be much closer. In that event, member credit unions would share jointly in the efficiency or inefficiency of

the operation, and the data processing program would arguably then be to the benefit of the entire credit union movement rather than being of primary benefit of just participants.

There shall be excluded all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income.

To read "royalty" as broadly as the League wishes would be to emasculate the statute. The word royalty connotes a payment received by the owner of a tangible or intangible good for another's use of that good.[10] If CAB's payment of a commission to the League may be characterized as a royalty, then so could almost any other business payment. We decline to make such a finding.

## IV. *Primarily volunteers?*

 The League employs fifteen individuals. Among these are Edgar Fontaine, who is the managing director, two administrative assistants, an executive secretary, an accountant and assistant accountant, a legal counsel and assistant, and a mail room employee. These all work in the home office. The League also employs five field representatives across the state.

The League argues that much of its work is done by volunteers and that it therefore should be exempted from paying tax by section 513(a)(1). Substantial amounts of volunteer work are done for the League by dedicated individuals, but the day-to-day work of the League is done by its paid staff. Indeed, far from meeting the requirement of section 513(a)(1) that "substantially all the work ... [be] performed for the organization without compensation" in order for the income to be exempt, substantially all of the League's involvement in its three income-producing activities is carried on by salaried employees.

## V. *Conclusion*

For the foregoing reasons, the insurance, data processing, and debt collection activities of the Louisiana Credit Union League constitute trades or businesses which are regularly carried on in large part by paid employees and which are not substantially related to the League's tax-exempt purpose. Therefore, the motion of the United States for partial summary judgment is GRANTED.

---

**10.** *See* Webster's New Collegiate Dictionary, 1010 (1977): "A share of the product or profit reserved by the grantor, especially of an oil or mining lease"; "a payment made to an author or composer for each copy of his work sold or to an inventor for each article sold under a patent."