## CAROLINA FARM & POWER EQUIPMENT DEALERS ASSOCIATION, INC., Plaintiff,

v.

## UNITED STATES of America, Defendant.

### No. 80–07–CIV–5.

United States District Court, E. D. North Carolina, Raleigh Division.

Jan. 20, 1982.

Thomas L. Norris, Jr., Curtis A. Twiddy, Poyner, Geraghty, Hartsfield & Townsend, Raleigh, N. C., for plaintiff.

William Woodward Webb, Asst. U. S. Atty., Raleigh, N. C., Victoria V. Brown, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

BRITT, District Judge.

Pursuant to order of referral, Magistrate Charles K. McCotter, Jr., on 12 June 1981 filed his memorandum and recommendation with regard to the cross motions for summary judgment in which he recommended that the defendant's motion be granted and the plaintiff's motion be denied. The matter is now before the Court on objections filed by the plaintiff on 2 July 1981.

The Court has considered each of the plaintiff's objections, supplemented by the reasoning and authorities cited in support thereof. An independent review of the record by the Court and a consideration of the authorities cited by the parties lead the Court to decline to adopt the recommendations of the Magistrate. This memorandum opinion explains fully the reasons for the Court's decision.

## FACTS

Carolina Farm & Power Equipment Dealers Association [hereinafter referred to as the Association] is a nonprofit corporation, organized under the laws of North Carolina and exempt from federal income taxes. *See* 26 U.S.C. § 501(c)(6) (1976). Primarily, it promotes and improves the business conditions and general welfare of independent retail distributors of farm and power equipment in North and South Carolina. Corporations, partnerships, and sole proprietorships comprise the Association's membership. Among its activities, the Association monitors state and federal legislation, conducts workshops relevant to the trade, publishes a newsletter and offers opportunities for group health insurance.

On 9 February 1955, the Association entered into a trust agreement, creating an insurance trust fund [hereinafter referred to as the Trust], with members of the Association's Board of Trustees serving as trustees. The Trust operates and funds an economical group insurance program available to the Association's members and their employees. Federated Mutual Implement

and Hardware Insurance Company of Owatonna, Minnesota [hereinafter referred to as Federated], issued a master group insurance policy to the Trust, with participants in this program receiving a certificate of coverage from the Trust. The program includes life, accident and health, and hospital and surgical policies. While enrollment in an insurance program is not a prerequisite to membership in the Association, only members and their employees may participate. Approximately forty-one percent (41%) of the membership participated during the years at issue here.

The Association employs four (4) people, all of whom operate, to some extent, the insurance program. One devotes full time, one two-thirds time, one one-third time, and one one-fourth time to this activity. The Association pays salaries to and provides office space for these employees, who render the following services:

1. Distribute information pamphlets to current and prospective members (although a representative of Federated handles initial enrollment);

2. Prepare and distribute monthly premium notices to members;

3. Forward to Federated the monthly premiums remitted to the Trust by its members;

4. Communicate with Federated any member's requested change in insurance coverage; and,

5. Provide information for members with questions concerning the insurance program.

Federated rebated to the Association as an administrative allowance an amount equal to seven percent (7%) of the gross accident and health insurance premiums, paying the sum in two installments during 1973, 1974, 1975 and 1976. Approximately two-thirds of this allowance was paid to the Association and was reflected on its financial statements as income to the Association. The remaining one-third was paid to the Trust and recorded as an income item to the Trust. For 1977, the entire administrative allowance was recorded as income to the Trust. Net receipts of the Trust were used to pay the Trust's operating expenses and maintain a reserve fund. Net receipts of the Association were used for its operating and general expenses.

In addition to these rebates, Federated paid to the Trust experience refunds, which consisted of amounts by which the annual premiums paid by the members exceeded the aggregate claims of those members under group coverage. The experience refunds were prorated to the members, however, rather than going into either the Trust funds or the Association's account.

Following an audit of the Association's tax returns, the Commissioner of Internal Revenue determined that the seven percent (7%) administrative allowance constituted unrelated business income. Experience refunds, on the other hand, were not considered unrelated business income. The Association paid this tax liability for 1973–77 and initiated an administrative claim for a refund. More than six months have elapsed since the filing of the claim, but the IRS has failed to notify the Association as to its status. Accordingly, on 3 January 1980 the Association initiated this civil action for a refund of the taxes paid.

## DISCUSSION

The central issue is whether the Association's involvement in making health insurance available to its members constitutes an unrelated trade or business. In some cases a tax is imposed on certain income of otherwise exempt organizations. 26 U.S.C. § 511 (1976). The Internal Revenue Code defines an unrelated trade or business as

Any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its . . . purpose or function constituting the basis for its exemption . . . .

26 U.S.C. § 513(a). Resolution of this question, based upon the preceding statute, involves two areas of analysis. First, the activity must be a trade or business regu-

larly conducted by the exempt organization. Second, the trade or business must not be substantially related to the exempt purpose of the organization. 26 C.F.R. § 1.513–1(a)(2) (1980). If either element is determined in favor of the exempt organization, then no tax is imposed on the income.

## I. TRADE OR BUSINESS OF THE ORGANIZATION

In making a determination regarding the income which the Association receives as a result of its members purchasing insurance, examination must first be made of the phrase "trade or business." If the Association's activities are not embraced by this concept, further inquiry is unnecessary, as the statute (section 511) would not apply.

### A. Plain Meaning of the Statute

Statutory interpretation begins with ascertaining, if possible, the plain meaning of the statute. *Touche Ross v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Although engaging in this canon of construction risks both oversimplification and belaboring the obvious, it nevertheless undergirds a more comprehensive focus on the legislation under consideration. When the language of the statute is sufficiently clear in its context, it controls. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) (and cases cited therein).

The term "trade or business" contemplates "any activity which is carried on for the production of income from the sale of goods or the performance of services." 26 U.S.C. § 513(c). The language limits the types of activities covered to those "carried on for the production of income." Distinctions exist between activities which are *designed* to produce income and those which generate income merely *incidental* to another primary purpose. The plain meaning of trade or business dictates examining the underlying reason behind the Association engaging in the insurance-related activity. Inasmuch as the Association's explicit purposes include providing opportunities for its members to obtain group health insurance, the logical rationale for this activity is to develop group insurance options rather than to produce income. The receipt of a small percentage of insurance premiums hardly seems the motivation for the Association's activity. The language of the statute suggests that when, as here, the activity is purposed primarily for reasons other than the production of income, it does not constitute a trade or business.

A plain meaning analysis was performed by another court, which reached a contrary conclusion. *Louisiana Credit Union League v. United States*, 501 F.Supp. 934, 939 (E.D. La.1980). The court focused on the phrase "*any* activity" to give expansive treatment to the statute. *Id.* This court declines to read the language of section 513 so broadly. To do so ignores the qualifying language in the statute, particularly "carried on for the production of income." Congress did not word the statute "any activity which *produces* income." Rather, it used the language "which is carried on for the production of income" to legislate the importance of considering an exempt organization's motivation for engaging in the questioned activity. This specific language, although subtle, cannot be ignored.

### B. Legislative History and Judicial Interpretation

Courts have not agreed on the meaning of section 513. Some courts focus on whether the activity is a trade or a business. *See, e.g., Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980); *Clarence LaBelle Post No. 217, Veterans of Foreign Wars of United States v. United States*, 580 F.2d 270, 279 (8th Cir. 1978), *cert. dismissed*, 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1979); *Disabled American Veterans v. United States*, 650 F.2d 1178 (Ct.Cl.1981); *Louisiana Credit Union League v. United States*, 501 F.Supp. 934 (E.D.La.1980); *St. Luke's Hospital of Kansas City v. United States*, 494 F.Supp. 85 (W.D.Mo.1980); *Oklahoma Cattlemen's Association v. United States*, 310 F.Supp. 320 (W.D.Okla.1969). Despite the appearance to this Court of a relatively clear meaning of the statute, the divergence among the

federal courts at every level[1] cloaks the statute with a presumption of ambiguity. Given such ambiguous language, resort to legislative history is in order. Although comfortable in its analysis of the statute's plain meaning, this Court will examine the relevant legislative history to aid in future consideration of the issue, as well as support its finding.

Section 501 exempts many organizations from the federal income tax. 26 U.S.C. § 501. Prior to 1950, an exempt organization could acquire commercial business enterprises and avoid paying taxes on the income generated by these enterprises.[2] *Clarence LaBelle*, 580 F.2d at 275 (Schatz, J., dissenting). This situation posed a competitive advantage for the exempt organization over its taxpaying counterparts, and Congress was advised to close this loophole in an effort to restore competition. Revenue Revision of 1950: Hearings Before the House Committee on Ways and Means, 81st Cong., 1st Sess. 4 (Statement of President Harry S. Truman). The explicit purpose of the legislation was to eliminate this unfair competition. S.Rep.No.2375, 81st Cong., 2d Sess. 28–29 (1950)[3] [hereinafter cited as Senate Report]. When Congress subse-

quently amended[4] this statute, the recognition of this purpose was underscored. "In general, the unrelated business income tax (section 511) was imposed to prevent tax-exempt organizations from having an unfair competitive advantage over taxable businesses." H.Rep.No.95–1108, 95th Cong., 2d Sess. ——, *reprinted in* [1978] U.S.Code Cong. & Ad.News, 3716, 3718.

The suggestion has been made that Congress desired primarily to raise revenues by closing this loophole. *Clarence LaBelle*, 580 F.2d at 272. While the Revenue Act of 1950, like most other revenue acts, undoubtedly contemplated raising revenues, the bulk of the additional revenue for that year came "from the imposition of higher corporate and individual income-tax rates," Senate Report, *supra*, rather than through the section 511 tax. The legislative history as a whole confirms that the purpose of section 511 centered on eliminating this unfair competition.

The regulations, promulgated to guide the interpretation of the income tax laws, bolster this conclusion. "The primary objective of adoption of the unrelated busi-

1. Three circuit courts which have considered the issue disagree as to the primary congressional purpose behind section 511 *et seq. Hope School v. United States*, 612 F.2d 298, 304 (7th Cir. 1980) (finding unfair competition to be the primary purpose); *Clarence LaBelle Post No. 217, Veterans of Foreign Wars of United States v. United States*, 580 F.2d 270, 273 (8th Cir. 1978), *cert. dismissed*, 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1979) (holding that Congress desired to raise revenue and, therefore, intended a broader interpretation of the statute); *Massachusetts Medical Society v. United States*, 514 F.2d 153, 154 (1st Cir. 1975) (focusing on correcting abuses by tax-exempt organizations). Likewise, various district courts have disagreed as to the proper interpretation of these sections. *See Louisiana Credit Union League v. United States*, 501 F.Supp. 934 (E.D. La.1980) (construing the plain meaning of trade or business to include virtually any activity); *St. Luke's Hospital of Kansas City v. United States*, 494 F.Supp. 85 (W.D.Mo.1980) (adopting a narrower view of the statute's scope).

2. Perhaps the most notable example concerned the acquisition of the C. F. Mueller Company, a manufacturer of noodles, by New York University. *See C. F. Mueller Co. v. Commissioner*,

190 F.2d 120 (3d Cir. 1951) (holding this activity exempt from income taxes under the law then in effect); Comment, The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations, 81 Harv.L.Rev. 1280 (1968).

3. The Report states:

The problem at which the tax on unrelated business income is directed is primarily that of unfair competition. The tax-free status of section 101 (now section 511) organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes. Also, a number of examples have arisen where these organizations have, in effect, used their tax exemptions to buy an ordinary business. That is, they have acquired the business with little or no investment on their own part and paid for it in installments out of subsequent earnings—a procedure which usually could not be followed if the business were taxable.

Senate Report, *supra*.

4. The wording of the amendment is not relevant to this case.

ness income tax was to eliminate a source of unfair competition ...." 26 C.F.R. § 1.513–1(b) (1980). *See also,* 26 C.F.R. § 1.513–1(c). Even if "the elimination of unfair competition is not the *sole* factor to be weighed [citation omitted], it is very important in determining whether a given activity is to be taxed as an unrelated trade or business." *Carle Foundation v. United States,* 611 F.2d 1192, 1196 n.6 (7th Cir. 1979).

On the whole, the purpose of the unrelated business income tax was to remove the unfair competitive edge. *Disabled American Veterans,* 650 F.2d at 1181. In light of this conclusion, attention must be directed to the nature of the Association's activities with respect to the insurance program. Basically the Association's employees performed the following services:

1. Distributing information pamphlets to members and prospective members describing the program (however, initial enrollment is handled by a representative of Federated);

2. Preparing monthly premium notices and distributing those notices to the members;

3. Forwarding to Federated monthly premiums remitted by the members to the Trust;

4. Forwarding to Federated changes in coverage requested by participating members; and,

5. Providing information to participating members who raise questions about the insurance program.

If the Association is actively engaged in the selling of insurance, no serious doubt could be entertained that such activity constitutes an unrelated trade or business. Participation in the competitive marketplace necessarily entails conducting a trade or business in the ordinary sense of the word. *See* 26 U.S.C. § 162 (1976).

■ The Association received rebates from Federated totaling seven percent (7%)

of gross accident and health insurance premiums as an administrative allowance. These rebates, which were used to offset the Association's expenses in providing the services to its members, hardly amount to profits in the ordinary sense. Yet even if they are deemed profits, that determination is not dispositive of the trade or business question. Evidence of profits alone is not controlling on this issue. *McDowell v. Ribicoff,* 292 F.2d 174, 178 (3d Cir.), *cert. denied,* 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 135 (1961). Additional facts must exist which indicate conduct amounting to a trade or business.

■ The Association hardly engages in the insurance business. No evidence exists that the Association controls the possible financial result of its activities. *Oklahoma Cattlemen's,* 310 F.Supp. at 322. While the Association participates in the insurance process as related to its members, it is dubious, at best, to classify these activities as the conduct of a trade or business. For an activity to reach the level of a trade or business under this statute, it must "be operated in a competitive, commercial manner." *Disabled American Veterans,* 650 F.2d at 1187. If the business herein is conducted in this manner, Federated, not the Association, is in control. The Association's activities do not fall within the ambit of a trade or business under section 513.

## II. SUBSTANTIALLY RELATED TO EXEMPT PURPOSE

Even assuming, *arguendo,* that the Association's activities amount to a trade or business, if those activities are substantially related to the exempt purpose of the Association the income is not taxable.[5] "[F]or the conduct of trade or business ... to be substantially related to purposes for which the exemption is granted, the production ... of the goods or the performance of the services ... must *contribute importantly* to the accomplishment of those purposes." 26 C.F.R. § 1.513–1(d)(2) (emphasis added).

---

5. The statute requires that the trade or business be carried on regularly. This Court finds that the Association's activities took place with sufficient frequency to satisfy this somewhat vague criterion.

Based upon the facts and circumstances of each case, a determination must be made of the relationship between the activities and the exempt purpose. *Carle Foundation*, 611 F.2d at 1198. *See Iowa State University of Science & Technology v. United States*, 500 F.2d 508, 205 Ct.Cl. 339 (1974).

The Association is a business league exempted from income taxation. 26 U.S.C. § 501(c)(6) (1976). A business league is an association whose members share a common business interest. Specifically, "its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons." 26 C.F.R. § 1.501(c)(6)–1. *See National Muffler Dealers Association v. United States*, 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979). In the instant case, the common business interest is the promotion of the farm and power equipment business. Given the parties' stipulation as to the Association's exempt status, attention centers on the relationship between the questioned activity and the exempt purpose.

To ascertain the exempt purpose, reference should be made to the Articles of Incorporation of the Association. *See Anateus Lineal 1948, Inc. v. United States*, 366 F.Supp. 118, 121–22 (W.D.Ark.1943). The Certificate of Incorporation for the Association, entered into 18 February 1954 and amended 22 January 1963, states that one object of the Association is "[t]o promote the general welfare of the farm and power equipment dealers in the States of North and South Carolina." Given the stipulated fact that the Association "consists of sole proprietorships, partnerships, and corporations" with approximately 421 total members during the years in question, this Court concludes that some members were able to procure group insurance benefits which would not have otherwise been available.[6] *See Oklahoma Cattlemen's*, 310 F.Supp. at 323. "Ordinarily, a trade or business is substantially related to the activities for which an organization is granted exemption if the principal purpose of such trade or business is to further (other than through the production of income) the purpose for which the organization is granted exemption." 26 C.F.R. § 1.513–2(a)(4). The availability of insurance programs promotes the general welfare of the business community comprised by the Association.

This Court notes two cases in general agreement with this position, on facts similar to those in the case at bar. *San Antonio District Dental Society v. United States*, 340 F.Supp. 11, 14–15 (W.D.Tex.1972); *Oklahoma Cattlemen's*, 310 F.Supp. at 322–23. A third case reached a contrary conclusion. *Louisiana Credit Union*, 501 F.Supp. at 940–41. The latter case, although more recent, fails to cite either of the prior cases in its discussion of the "substantially related" issue. *Id.* The analysis in *Louisiana Credit* appears unpersuasive to this Court, due in large part to its failure to consider this rationale in *San Antonio* and *Oklahoma Cattlemen's*. Based upon an examination of the legislation and regulations relevant to this issue, the activities of the Association in aiding its members to obtain group insurance bear an important relationship to its exempt purpose, i.e., the promotion of the general welfare of the farm and power equipment communities in North and South Carolina. This Court concludes that the Association satisfies the "substantially related" criterion.

## CONCLUSION

Congress occasionally provides an incentive, in the form of income tax exemptions, for certain activities it has determined are particularly desirable. That very policy underlies the exempt status afforded nonprofit organizations under section 501. The tax liability of those organizations, revised in section 511, applies when such an otherwise exempt entity engages in an activity which rises to the level of a trade or business which is not substantially related to its exempt purpose. 26 U.S.C. § 513(a). For the reasons set forth in this opinion, this Court

6. The parties stipulated that, during the years in issue, forty-one percent (41%) of the Association's members participated in the insurance program.

concludes that the Association does not fall within the ambit of section 513(a).[7] Since the taxes were wrongfully imposed for the years in issue, the Association is entitled to a refund of those taxes paid. The parties are directed to submit to the Court a recomputed refund due plaintiff, pursuant to their prior stipulation filed 18 December 1980.

SO ORDERED.

---

**7.** Since the Court disposes of this matter on the meaning of section 513(a), it does not reach the Association's final contention, that the rebates constitute a trust fund for its members.