JAMES E. LATIMER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2853–67. Filed December 15, 1970.

*Robert L. Jackson,* for the petitioner.
*Edward G. Lavery,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in petitioner's Federal income tax for taxable year 1963 in the amount of $12,950.31. The two issues remaining for our decision are whether petitioner realized a long-term gain in taxable year 1963 upon receipt of insurance proceeds paid on the destruction of property by fire, and if so, whether petitioner is entitled under section 1033(a)(3), I.R.C. 1954,[1] to postpone recognition of this long-term gain.

#### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference. Petitioner, James E. Latimer, resided in Kansas City, Mo., at the time of the filing of the petition herein. Petitioner filed his 1963 Federal income tax return and an amended return with the district director of internal revenue at St. Louis, Mo.

Petitioner and his late wife, Lois, obtained a leasehold interest in property located in Jackson County, Mo., in 1943, the property having a one-story brick building upon it. The lessor was one Tillie Schermesser, the daughter of the owner of the property, who had assigned his interest to Tillie on May 17, 1924. The original lease, executed on May 15, 1924, was to run for 99 years and provided in part that:

All improvements now or hereafter erected on said leased and rented premises shall be insured for their reasonable insurable value in Standard Fire Insurance Companies licensed to do business in this state and all policies issued for such insurance shall be written in the Names of lessor and lessees and the pre-

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

miums shall be paid by lessees and such policies for such insurance shall be delivered into custody of and kept by lessor. Should lessees fail to so insure such improvements the lessor shall have the right to so insure such improvements and shall be permitted to charge lessees interest for premiums so paid at the rate of eight (8) percent per annum until reimbursed by lessees and the lessor shall have a lien upon all the rights of the lessees in and to the said leased and rented premises for such premiums so paid by the lessor and such interest thereon shall be paid by lessees to lessor on the first day of the month following such payment made by lessor. Should the building now or hereafter erected on said land be destroyed then and in that event any money collected as insurance therefor shall be used to replace said building but the lessor shall not be liable for any part of the cost of such replacement. * * *

In 1945, Latimer Motors, Ltd., petitioner's wholly owned corporation, purchased the land adjacent to that described in the 1924 lease. Latimer Motors, Ltd., continued in existence and continued to own this land for all subsequent times relevant to this case. In or about 1948, Latimer Motors, Ltd., caused a building to be constructed upon its land. The new building joined the one already existing upon the leased land. Lois Latimer died in 1959 and petitioner married Jean Price in 1960.

Prior to 1961 petitioner and the corporation operated a Dodge-Plymouth dealership in the two buildings. On June 9, 1961, Latimer Motors, Ltd., petitioner, and his wife, Jean, leased (subleased) their respective interests in both parcels of land and the buildings thereon to McIntosh Motors, Inc. (a Missouri corporation), Howard L. McIntosh, and Marjory L. McIntosh, his wife. The lease by its terms was to continue for 10 years beginning June 15, 1961, and ending June 14, 1971, at a monthly rental of $1,000, with an option to renew it upon the same terms for two successive 5-year periods. The lease also contained the following provisions:

12. DAMAGE BY CASUALTY: If, during the term hereof or previous thereto, the premises, or any building of which the premises are a part, shall suffer damage by fire, explosion, providential means or any other casualty to the extent that the premises or building cannot reasonably be repaired within sixty days after date of such damage, or to such an extent that under the then existing laws, orders, ordinances or other public requirements the same cannot be repaired to substantially the same form and with substantially the same materials as before such damage, then the term hereby created shall terminate as of the date of such damage and rent shall cease as of the date of such damage, with proportionate refund of any prepayment, on condition LESSEE forthwith surrenders the premises to LESSOR. * * *

On June 15, 1963, the adjoining buildings on both parcels of land were destroyed by fire. At that time petitioner's adjusted basis in the building situated upon the land being leased from Tillie Schermesser was $11,856.86. At the time of the fire the buildings were insured against fire damage by two insurance policies. The premiums on the two policies had been paid by Latimer Motors, Ltd., and petitioner.

One policy (No. 274277) insured the building on the property being leased from Tillie Schermesser for $50,000. The named insured were "J. E. Latimer and Latimer Motors, Ltd., as their interests may appear." The other policy (No. 772063) was written by the same insurance underwriter. It insured the building owned by Latimer Motors, Ltd., for $60,000. On June 26, 1963, the insurer issued a check in the amount of $110,000. Of this amount, $50,000 was due to petitioner as payment for the fire loss under the terms of policy No. 274277. The remaining $60,000 was due to Latimer Motors, Ltd., as payment for the fire loss under the terms of policy No. 772063. Petitioner put the $110,000 into a bank account maintained by Latimer Motors, Ltd., and $50,000 was credited to petitioner's drawing account on the corporation's books.

Petitioner's wife, Jean Price Latimer, throughout 1963 and 1964, controlled and partially owned the National School of Aeronautics, Inc. (NSA), a Missouri corporation. NSA was in the business of teaching skills required for jobs in the airline industry. Each student signed a contract whereby he agreed to pay his tuition over a specified period of time. Each student who did not make immediate payment in full signed an unsecured promissory note for the unpaid portion.

The insurance proceeds of $110,000 were taken from the bank account of Latimer Motors, Ltd., and were used by February 1964, to purchase student contracts and promissory notes from NSA. At least $50,000 of the promissory notes were assigned to petitioner without recourse. Petitioner expected the corporation to collect the money due on the contracts and remit it to him. In addition to the aforesaid $110,000, both petitioner and Latimer Motors, Ltd., used other money of their own to purchase student contracts and promissory notes from NSA. From at least the beginning of 1963 onward, NSA was, by petitioner's own estimate, in bad financial condition. At the time petitioner put the insurance proceeds into the student contracts and promissory notes he was still vice president in charge of personnel at NSA. NSA collected the money on the student contracts and promissory notes owned by petitioner as the payments became due, but it failed to remit the money to petitioner.

On September 29, 1966, NSA filed a petition in the U.S. District Court for the Western District of Missouri, seeking an arrangement under chapter XI of the Bankruptcy Act. A plan of arrangement was confirmed on July 28, 1967. The debtor corporation failed to meet the requirements of the plan, however. Therefore, on September 13, 1968, the arrangement proceeding was dismissed and the debtor was adjudicated a bankrupt.

Through the end of the year 1966 neither petitioner nor Latimer Motors, Ltd., had recovered any portion of the $110,000 invested in

the student contracts and promissory notes. On his 1966 Federal income tax return, petitioner claimed a business bad debt deduction for $50,000 of the aforesaid investment of $110,000. The deduction was partially allowed by the Commissioner in that year and the remainder was allowed in other years.

At no time prior to the fire had petitioner informed Tillie Schermesser that he was carrying fire insurance on the premises. After the fire petitioner did not inform her that $50,000 had been paid by the insurance company on account of the fire on the premises leased from her. Tillie Schermesser was not consulted as to what type of building, if any, should be constructed on the leased premises in place of the burned one. After the fire of June 15, 1963, McIntosh Motors, Inc., Howard L. McIntosh, and Marjory L. McIntosh terminated the lease between themselves and Latimer Motors, Ltd., petitioner, and Jean P. Latimer.

Thereafter, by instrument dated March 2, 1965, Latimer Motors, Ltd., and petitioner leased their respective interests in both parcels of land to the B. F. Goodrich Co. for a term of 10 years at a monthly rental of $1,000 with an option to the tenant to renew for two successive 5-year terms at an increased rental. After the lease was signed Latimer Motors, Ltd., and petitioner contracted to have a new building constructed. When the new building was completed in the latter part of 1965, it occupied both parcels of land and was built to the specifications of the B. F. Goodrich Co. Petitioner could have constructed a new building prior to the end of 1964. He did not do so because he had not located a tenant for it as that time.

Petitioner did not file any application during 1963 or 1964 for an extension of time within which to replace the destroyed building which had been situated upon the land leased from Tillie Schermesser. However, on his 1963 Federal income tax return petitioner stated that the proceeds from the insurance policy, $50,000, would be reinvested in a new building to be constructed during 1964.

On June 16, 1965, the Internal Revenue Service had begun an examination of petitioner's income tax liability for the years 1963 and 1964 and on that date an agent of the Internal Revenue Service so notified petitioner. The taxability of the $50,000 insurance proceeds was an issue discussed at that time.

Petitioner gave to Floyd R. Brown, Jr., a certified public accountant, a power of attorney to represent petitioner before the Internal Revenue Service with respect to his taxable years 1963 and 1964, among others. On October 20, 1965, Mr. Brown sent an application for an extension of time within which to replace the destroyed building to the district director of internal revenue at St. Louis, Mo.

On November 16, 1965, the district director of internal revenue at St. Louis, Mo., by Leroy N. Thibault, chief, audit division, sent a reply to Mr. Brown. Therein he stated that:

Based on the information which you have furnished it is our considered opinion that your client has failed to show reasonable cause for not being able to replace the converted property by December 31, 1964. Furthermore, it is our opinion that your client has failed to show reasonable cause for not filing the application within the required period of time nor has such application been filed within a reasonable time as required by Section 1.1033(a)–2(c)(3) of the Regulations.

Accordingly, your application, on behalf of Mr. James E. Latimer, is denied.

The Commissioner determined that there was a long-term gain of $38,143.14 realized in 1963 to be recognized since petitioner had failed to comply with the provisions of section 1033(a)(3)(B)(ii) dealing with extensions of time for replacement of involuntarily converted property.

OPINION

The issues before us are whether petitioner realized any long-term gain on receipt of $50,000 of insurance proceeds for destruction of a building by fire, and if so, whether petitioner may avail himself of the provisions of section 1033(a)(3) [2] and not recognize the realized gain in 1963.

---

[2] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\* \* \* \* \* \* \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, \* \* \* at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property \* \* \*. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. \* \* \*

\* \* \* \* \* \* \*

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) 2 years after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

As to whether petitioner realized any long-term gain, he relies on a provision in the lease stating that:

Should the building now or hereafter erected on said land be destroyed then and in that event any money collected as insurance therefor shall be used to replace said building but the lessor shall not be liable for * * * the cost of such replacement.

He contends that this provision casts him in the role of "a trustee under the terms of the lease * * * to see that the insurance proceeds were used on the leased property." However, the lease also provided that insurance was to be written in the names of the lessor and lessee and that the policies were to be delivered into the custody of and kept by the lessor. These last two requirements of the lease were not met since the policies were written in the names of J. E. Latimer and Latimer Motors, Ltd., and Tillie Schermesser was not informed of either the taking out of the policies or the payment by the insurer. Furthermore, she was not consulted as to what type of, if any, replacement property should be constructed upon the leased premises. We do not believe that petitioner can now seek refuge behind the terms of the lease, when heretofore he has conducted himself without regard to the provisions therein.

We think the Commissioner's position is correct; that petitioner held the proceeds under a claim of right. *North American Oil* v. *Burnet*, 286 U.S. 417 (1932).

This position is borne out by petitioner's crediting $50,000 to his drawing account on the books of Latimer Motors, Ltd., and his subsequent use of the $50,000 in an attempt to financially rescue NSA, a corporation owned by his wife. As was said in *Healy* v. *Commissioner*, 345 U.S. 278, 282 (1953) : "There is a claim of right when funds are received and treated by a taxpayer as belonging to him."

If one claims to be a trustee then he should act like one, but if he acts as the true owner then we see no reason not to treat him as such for tax purposes. "If he holds with claim of right, he should be taxable as an owner, regardless of any infirmity of his title." *National City Bank of New York* v. *Helvering*, 98 F.2d 93, 96 (C.A. 2, 1938), quoted in *Phillips* v. *Commissioner*, 262 F.2d 668, 672 (C.A. 9, 1959).

As to whether petitioner must recognize the gain in 1963, he relies on section 1033 of the Code and the regulations under section 1033 (a) (3) (B) (ii) which provide in part:

Sec. 1.1033(a)–2 Involuntary conversion where disposition of the converted property occurred after December 31, 1950.—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(c) *Conversion into money or into dissimilar property.* (1) If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily

converted into money or into property not similar or related in service or use to the converted property, the gain, if any, shall be recognized, at the election of the taxpayer, only to the extent that the amount realized upon such conversion exceeds the cost of other property purchased by the taxpayer which is similar or related in service or use to the property so converted, or the cost of stock of a corporation owning such other property which is purchased by the taxpayer in the acquisition of control of such corporation, if the taxpayer purchased such other property, or such stock, for the purpose of replacing the property so converted and during the period specified in subparagraph (3) of this paragraph.

(2) * * * If, after having made an election under section 1033(a)(3), the converted property is not replaced within the required period of time, or replacement is made at a cost lower than was anticipated at the time of the election, or a decision is made not to replace, the tax liability for the year or years for which the election was made shall be recomputed. * * *

(3) The period referred to in subparagraphs (1) and (2) of this paragraph is the period of time commencing with the date of the disposition of the converted property, or the date of the beginning of the threat or imminence of requisition or condemnation of the converted property, whichever is earlier, and ending one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or at the close of such later date as may be designated pursuant to an application of the taxpayer. Such application shall be made prior to the expiration of one year after the close of the first taxable year in which any part of the gain from the conversion is realized, unless the taxpayer can show to the satisfaction of the district director—

(i) Reasonable cause for not having filed the application within the required period of time, and

(ii) The filing of such application was made within a reasonable time after the expiration of the required period of time.

The application shall contain all of the details in connection with the involuntary conversion. Such application shall be made to the district director for the internal revenue district in which the return is filed for the first taxable year in which any of the gain from the involuntary conversion is realized. No extension of time shall be granted pursuant to such application unless the taxpayer can show reasonable cause for not being able to replace the converted property within the required period of time.

Thus, under the regulations above, petitioner must show *both* a reasonable cause for not having filed his application for an extension of time within the requisite period and that the subsequent filing of the aforesaid application was made within a reasonable time after the expiration of the required time period. This is so because the facts show that the property involved herein was not replaced within the statutory period which expired on December 31, 1964.[3]

We feel that petitioner has failed to show compliance with either of the above requirements.

As to the reasonable cause for failing to file the application within

---

[3] Although sec. 1033(a)(3)(B)(i) now provides for a 2-year replacement period, for the year in question, 1963, the period for replacing involuntary converted property was only 1 year. The 2-year period was added by sec. 915(a) of the Tax Reform Act of 1969 and applies to dispositions of converted property occurring after Dec. 30, 1969.

the time limit, petitioner offers no proof as to a reasonable cause for this failure save that he could not find a tenant until March 1965. This may be sufficient grounds for failing to replace the property within the statutory time, but certainly will not suffice as reasonable cause for failing to file the application for extension of time within the required time.

With regard to the reasonableness of the subsequent filing of the application, it was not until October 1965 that petitioner filed his application, when the time period expired on December 31, 1964. This was after petitioner signed a lease with his new tenant and even after the Internal Revenue Service had begun an audit of 1963 with one of the issues discussed being the taxability of the gain from the conversion. Petitioner offers no proof on the reasonableness of the 10-month delay and we must hold against him. Accordingly,

*Decision will be entered for the respondent.*