PROFESSIONAL INSURANCE AGENTS OF MICHIGAN, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11748–78.     Filed February 17, 1982.

*Bruce B. Hart*, for the petitioner.
*William F. Garrow*, for the respondent.

DAWSON, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| TYE Sept. 30– | Deficiency |
|---|---|
| 1974 | $17,200.57 |
| 1975 | 41,692.72 |
| 1976 | 24,134.69 |

After concessions, the issues for decision are whether the following amounts received by petitioner, a business league of insurance agents exempt from taxation pursuant to section 501(c)(6),[1] constituted unrelated business taxable income under section 512:

(1) Fees received for performing various promotional and administrative services in connection with certain malpractice, health, disability, and life insurance programs which petitioner sponsored or helped make available to its members; and

(2) An experience rating reserve refund received from an insurance company upon termination of a group health and life policy which petitioner had contracted for and made available to its members.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference.

Professional Insurance Agents of Michigan (hereinafter referred to as PIA or petitioner) was originally formed on April 20, 1937, as an unincorporated association under the laws of the State of Michigan and operated as such until May 27, 1956. The association was incorporated on May 28, 1956, under Michigan Act No. 372 of Public Acts of 1931, as amended, as a nonprofit corporation under the name of Michigan Association of Mutual Insurance Agents. On October 1, 1976, petitioner changed its name to Professional Insurance Agents of Michigan.

Petitioner's principal place of business at the time the

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue, unless otherwise indicated.

petition in this case was filed was located in Lansing, Mich. Petitioner timely filed Forms 990 (Return of Organization Exempt from Income Tax) and 990-T (Exempt Organization Business Income Tax Return) for the taxable years ended September 30, 1974, 1975, and 1976, with the Internal Revenue Service Center in Philadelphia, Pa. Its income was computed according to the cash method of accounting.

On April 8, 1958, respondent ruled that petitioner was exempt from Federal income taxation as a business league under section 501(c)(6).

Article II of petitioner's articles of incorporation (non-profit) described the objectives of the business league as follows:

The object of this Association shall be to maintain and extend the American Agency System, which system is defined to be the production of insurance premiums and service of insurance contracts by insurance agents operating solely on a commission basis on their own account as independent contractors, owning their own expirations and who maintain their own offices separate from any insurance company; to promote the equitable rights of its members; to provide its members with increased knowledge thru education in insurance underwriting and selling, loss prevention and agency management; to promote a high standard of ethics, friendship and cooperation among its members, to better serve the public, themselves, their companies and to professionalize the industry; to oppose bad practices of insurance and to cooperate with the Department of Insurance of the State of Michigan.

About 1,000 of the nearly 2,400 eligible insurance agents in Michigan belonged to petitioner during the years in issue. Many of the other agents belonged to a rival trade organization similar to petitioner operating under the name of Independent Insurance Agents of Michigan. The average member of petitioner was a relatively small insurance agency with an average of three to five employees, writing primarily personal lines of coverage such as automobile and homeowners' insurance and generating an average annual premium volume of around $400,000.

Upon becoming a member of petitioner, an insurance agent (agency) automatically became a member of the National Association of Professional Insurance Agents (National Association). This was a nationwide organization of insurance agents whose membership consisted of the members of the various State and regional affiliates. Despite their shared membership, petitioner and the National Association were separate,

autonomous organizations, operated independently of one another. The governing body of the National Association was a board of directors comprised of two or three directors elected by each local organization.

Memberships in petitioner were made available in the following categories:

(a) A-Agency, a partnership or corporation. This was a voting membership. Only one vote was given to a member under this category, even though the member may have consisted of more than one person as a partner or employee in a partnership or corporation.

(b) B-Agency, sole proprietorship not incorporated. This was a voting membership with one vote per sole proprietorship.

(c) C-Associate Member. This was a nonvoting membership open to those whose businesses were related to the insurance industry; for example, underwriters and insurance carriers.

(d) D-Subscription Member. This was a nonvoting membership that was available to employees of A or B Agency members and entitled them to receive publications and mailings of the National Association.

New and prospective PIA members were mailed a membership packet containing explanatory material concerning the various programs made available to the membership by petitioner and the National Association. This included information on educational seminars, educational programs leading to certification as qualified insurance counselors, copies of the various newsletters and magazines which members were entitled to receive, and brochures on various group insurance programs.

Membership benefits offered by petitioner during the years in issue included the following:

(a) Members were provided the opportunity to attend various conventions, seminars, and educational programs conducted or sponsored by petitioner relating to the insurance industry.

(b) Members were given a subscription to The Promoter, a bimonthly periodical published by petitioner, which included articles of interest to the membership and news items selected to keep members informed of matters pertaining to the insurance industry.

(c) Members were given a subscription to the Mich-A-Gram,

a newsletter published by petitioner, informing them of matters of interest such as seminars, educational opportunities, and legislative developments affecting the insurance industry.

(d) Members were provided representation before the State of Michigan legislative and regulatory bodies.

(e) Members were provided the opportunity to apply for coverage (for themselves and their employees) under (1) a group life and health insurance policy underwritten by the Independent Liberty Life Insurance Co., (2) an "Errors and Omissions" liability policy sponsored by the National Association and underwritten by the Utica Mutual Insurance Co., and (3) certain other group insurance policies sponsored by the National Association.

### *Additional Facts Pertaining to Insurance Programs*

Errors and Omissions (E & O) insurance is a type of professional malpractice insurance which protects the insurance agent from liability in the event his client suffers a loss as a result of errors made in writing a policy. The insurance is expensive and difficult to underwrite and the insurance carriers who offer it prefer to spread their risk by selling to a national market on a group, rather than an individual, basis. As a result, the market for coverage on an individual basis was both limited and volatile, with insurance companies occasionally finding it necessary to discontinue the coverage soon after entering the market.

In order to increase the availability of the insurance and maintain continuity of coverage, the National Association agreed to sponsor an E & O program carried by the Utica Mutual Insurance Co. (Utica Mutual). In return for sponsoring the program, the National Association received a fee equal to 15 percent of the gross premiums received by Utica Mutual. The National Association in turn remitted an amount to petitioner equal to 8 percent of the gross premiums paid by petitioner's members as compensation for its efforts in promoting the E & O program.

The services petitioner performed in connection with the E & O program consisted principally of including in the membership packets a brochure describing the E & O program and a rate schedule which enabled the member to calculate the

premium cost. The brochure bore the name and insignia of the National Association and instructed interested members to write the national office in Washington, D.C., for an application.

In addition, petitioner promoted the benefits of E & O insurance at educational seminars, ran occasional articles describing the program in its bimonthly publication, and answered telephone inquiries concerning the program. However, petitioner did not perform any services regarding the processing of applications, premiums, or claims, nor did it maintain records as to which of its members were participants in the program.

There was no contractual agreement between the National Association and petitioner regarding the division of the 15-percent fee paid by Utica Mutual. The National Association was free to discontinue the fee-splitting arrangement unilaterally at any time. However, in that event, petitioner would have considered looking elsewhere for an E & O program to sponsor for its membership.

During the years in issue, approximately 75 to 80 percent of petitioner's members subscribed to the E & O coverage sponsored by the National Association. Nonmember insurance agents were also permitted to enroll in the plan.

Petitioner also promoted to its members group life, supplemental life, dependent's life, accidental death and dismemberment, and long-term disability insurance programs which were sponsored by the National Association and underwritten by private insurance companies. The services petitioner performed in this regard were similar to the services provided in connection with the E & O program, and included the mailing of descriptive brochures to new or prospective members as part of their membership packet. In return for its promotional efforts, petitioner received a fee from the National Association equal to 4 percent of all premiums paid by its members.

During the years in issue, petitioner provided its members with an opportunity to subscribe to a group health and life insurance policy offered by Independent Liberty Life Insurance Co. (Independent Liberty). A similar policy was also sponsored by the National Association, but petitioner believed its plan to be a better value at a better price.

The master group insurance policy between petitioner and

Independent Liberty did not disclose the existence of an arrangement between them whereby petitioner was to receive a percentage of all premiums paid to Independent Liberty by its members. The terms of that arrangement were set forth in a letter dated January 1, 1974, from William Hill, vice president of Group Insurance Marketing for Independent Liberty, which provided as follows:

This will confirm that Group Life and Health coverages underwritten by Independent Liberty Life Insurance Company became effective on January 1, 1974 for participating members of The Michigan Association of Mutual Insurance Agents.

The Association will perform certain services on behalf of Independent Liberty such as: Publicizing the program and collecting applications, maintaining an inventory and issuing group certificates, reviewing all claims for submission to the company's claims department, disbursing claim drafts, coordinating communications between the company and the memberships regarding underwriting and claim problems, and assisting the company in making other company products available to the general membership.

Because these services are to be performed on behalf of Independent Liberty to provide better service for the association members, we will reimburse the Association for a portion of its increased administrative cost by paying a service fee of 6% of the monthly collected premium. The Association should receive the service fee shortly after the close of each month and will continue as long as the Association continues to provide the agreed upon services.

In accordance with this agreement, petitioner performed several different services in connection with the Independent Liberty group plan. Petitioner actively promoted the plan and maintained a stock of brochures and enrollment applications bearing its name and insignia which it mailed to members upon request. This material was also included in the membership packet mailed to new or prospective members. In addition, petitioner functioned as a clearinghouse for the paperwork between the members and the insurance company. With the exception of premium payments, which were generally billed and paid directly without the assistance of petitioner, all enrollment applications, claims, and other correspondence were sent to petitioner for initial processing and review, after which the information was forwarded to Independent Liberty. Likewise, certificates of coverage, payments on claims, and correspondence from the company to the members were normally routed through petitioner.

None of these services was particularly time consuming, and

petitioner's staff spent relatively little time promoting and administering the plan. For its administrative and promotional efforts, petitioner received 6 percent of the premiums paid by its enrolled members.

Access to low cost group health and life insurance was important to petitioner's members because it helped them to compete for employees in the marketplace. However, under Michigan insurance regulations, an agency with less than 10 employees was not permitted to negotiate its own group life insurance plan directly with an insurance company. This rule also effectively barred the agency from negotiating its own group health plan, since most insurance companies (including Independent Liberty) did not offer health insurance independently of life on a group basis. As a result, the only recourse for many small insurance agencies who wished to offer group insurance as a fringe benefit was to enroll in a multiple-employer plan (such as petitioner's) whose existence was permitted under the regulations, provided certain conditions were satisfied.

In addition to petitioner's plan, there were several other multiple-employer plans operating in Michigan which were not restricted to a single trade and, thus, were open to insurance agencies, including a group health and life plan sponsored by petitioner's competitor, Independent Insurance Agents of Michigan. However, petitioner's plan was particularly advantageous to the members because the association was able to serve as a valuable go-between whenever problems arose between the insurance company and a member agency. In the event a member experienced difficulty in settling a claim, for example, petitioner would intercede on his behalf and attempt to expedite the settlement process. Another advantage to the members was that petitioner regularly monitored the plan to insure that their needs were being satisfied in terms of benefits and coverage.

Somewhere between 20 and 30 percent of the members participated in the Independent Liberty program. Those who did not, generally fell into one of two groups: (1) Those with few or no employees who had no need for group insurance benefits, or (2) those with 10 or more employees who chose to negotiate their own plan directly with an insurance company.

At no time during the years in issue was petitioner licensed

as an insurance agent or broker under any Federal or State laws.

*Additional Facts Pertaining to the
Refund of the Experience Rating Reserve*

On February 6, 1969, petitioner incorporated Agent's Service Exchange, Inc. (ASE), a wholly owned subsidiary operated for profit. Between February 6, 1969, and September 30, 1973, petitioner promoted and administered its group insurance programs through ASE. ASE discontinued active operations on September 30, 1973, at which time management of the insurance programs was transferred to petitioner. ASE was formally liquidated on January 21, 1976.

From 1964 through December 31, 1973, petitioner directly, and through ASE (during that corporation's active existence), provided a group health, life, and disability insurance program to its members through a master group insurance policy with Time Insurance Co. (Time Insurance) of Milwaukee, Wis. This policy was terminated on January 1, 1974, and was replaced by the Independent Liberty group health and life policy.

The master group policy included four separate types of coverage set forth below:

| Group number | Type of plan |
|---|---|
| 3462 | Major medical life |
| 4030 | Supplementary life |
| 3950 | Over 65 health life |
| 5193 | Long-term disability |

Group number 3462 (major medical life) was the only plan with an experience rating reserve clause. Petitioner and Time Insurance added the clause to the policy in 1969. An experience rating reserve (ERR) represents a percentage of the premium dollar which is set aside by the insurance company for protection against future unforeseen or larger than anticipated losses, and is intended to add a measure of stability to annual premium rate increases. During the period in which the ERR clause was in effect, $57,637 was accumulated in the reserve by Time Insurance.

By letter dated November 12, 1973, petitioner notified Time Insurance that all policies between them would be canceled as of January 1, 1974, the next quarterly renewal date. Time

Insurance responded in a letter dated November 20, 1973, in which it stated that it would have no liability whatsoever for claims stemming from medical expenses incurred after December 31, 1973. The letter further stated that Time Insurance would make a final accounting to petitioner concerning the accumulated reserve of plan 3462 one year after the January 1, 1974, termination date. This 1-year claim-lag period was provided in order to insure that most, if not all, claims arising under the policy prior to the termination date were filed and settled before the balance remaining in the reserve was refunded.

On March 18 and March 24, 1975, respectively, representatives of petitioner and Time Insurance executed an agreement relating to the ERR refund which provided in part:

> It is agreed that Time Insurance Company will refund to Michigan Association of Mutual Insurance Agents a sum in the amount of $43,227.76, in accordance with the Experience Rating Refund formula, upon written acceptance of this release which provides for the following two stipulations:
>
> 1. The distribution of such funds to members of the Association is the sole obligation of the Association, and,
>
> 2. any benefits yet to be paid under the above-named group contract shall be paid by Time Insurance Company only upon the receipt from the Association of the necessary funds. This stipulation shall not bind the Association to any sum, in aggregate, greater than the fund herewith returned.

Pursuant to this agreement, petitioner received a refund check in the amount of $43,227.76 which it deposited in its general checking account on March 31, 1975. This amount represented 75 percent of the balance of the reserve fund. The remaining 25 percent was retained by the insurance company as a penalty in accordance with the terms of the retention clause in the original master group policy.

No additional claims under plan 3462 surfaced following the expiration of the 1-year claim-lag period. Consequently, petitioner was never called upon to pay over any portion of its refund to Time Insurance to discharge any such claims. Petitioner also made no attempt to distribute any portion of the refund to its members.

### Other Facts

During the 1975 and 1976 taxable years, petitioner spon-

sored for its members a management plan offered by Agency Records Control, Inc. (ARC), whereby petitioner's members were given the opportunity to purchase various office book-keeping systems from ARC. Under the terms of an agreement with ARC, petitioner was to be paid 5 percent of all billings to those members who participated in the plan. This fee was intended to compensate PIA for its role in persuading member agencies to join the plan.

During these same taxable years, petitioner also received certain amounts in connection with a premium financing plan offered by National Agents Service Co., Inc. (NASCO), which enabled participating members to borrow funds to help finance their insurance premiums. This program was sponsored by the National Association in return for promotional fees from NASCO. A portion of these fees was remitted to petitioner to compensate it for its promotional efforts at the State level.

During the years in issue, petitioner's gross receipts for promoting the group insurance, management, and financing plans, and the expenses allocable thereto, were as follows:

|  | TYE Sept. 30— | | |
| Program description | 1974 | 1975 | 1976 |
|---|---|---|---|
| Group life, supplemental life, and dependent's life | $1,696.56 | $3,057.98 | $2,666.57 |
| Errors and omissions (Utica Mutual) | 21,242.77 | 25,978.63 | 32,991.28 |
| Group health and life (Independent Liberty) | 16,709.52 | 27,576.11 | 24,570.62 |
| Disability | 3,487.51 | 5,046.89 | 4,628.07 |
| Premium financing | 0 | 405.34 | 846.23 |
| Management | 0 | 1,607.80 | 3,882.56 |
| Total gross receipts | 43,136.36 | 63,672.75 | 69,585.33 |
| Allocable expenses | (3,350.64) | (4,545.71) | (3,820.93) |
| Net income | 39,785.72 | 59,127.04 | 65,764.40 |

In his notice of deficiency, respondent determined, among other things, that the foregoing net receipts constituted unrelated business taxable income under sections 511 through 513. Petitioner has conceded the correctness of respondent's determination insofar as it relates to the amounts received in connection with the management plan and the premium financing plan.

OPINION

## Issue 1. Group Insurance Promotional Fees

Respondent has conceded that during the years in issue, petitioner qualified as a tax-exempt business league under section 501(c)(6).[2] Such organizations are described in section 1.501(c)(6)–1, Income Tax Regs., as follows:

A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. * * *

Notwithstanding its qualification under these provisions, a business league may still be liable for the tax imposed by section 511 to the extent it has unrelated business taxable income (UBTI). That term is defined in section 512(a)(1) as the gross income derived by an organization from any unrelated trade or business regularly carried on by it, less allowable deductions and other adjustments provided in section 512(b). Subject to a few exceptions not relevant here, section 513(a) defines "unrelated trade or business" as any trade or business the conduct of which is not substantially related (aside from the need of the organization for income or funds or the use it makes of the profits derived) to the organization's exempt purpose. Summarizing these provisions, section 1.513–1(a), Income Tax Regs., states that, in general, gross income must be included in the computation of UBTI if three requirements are met: (1) The income is derived from a trade or business; (2) the trade or business is regularly carried on by the organization; and (3) the conduct of the trade or business bears no substantial relation (other than through the production of

[2]Sec. 501(c)(6) exempts the following organizations:

(6) Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

funds) to the organization's exempt purpose. Our task is to determine whether petitioner's insurance activities satisfied these criteria.

## A. Trade or Business

Section 1.513–1(b), Income Tax Regs.,[3] added by T.D. 6939, 1968–1 C.B. 274, and applicable with respect to taxable years beginning after December 13, 1967, establishes the general rule that an activity which qualifies as a trade or business under section 162 will normally present sufficient likelihood of unfair competition[4] to be within the intendment of section 513.

---

[3]Sec. 1.513–1. Definition of Unrelated Trade or Business.

(b) *Trade or business*. The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete. On the other hand, where an activity does not possess the characteristics of a trade or business within the meaning of section 162, such as when an organization sends out low-cost articles incidental to the solicitation of charitable contributions, the unrelated business income tax does not apply since the organization is not in competition with taxable organizations. However, in general, any activity of a section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax. Accordingly, for purposes of section 513 the term "trade or business" has the same meaning it has in section 162, and generally includes any activity carried on for the production of income from the sale of goods or performance of services. Thus, the term "trade or business" in section 513 is not limited to integrated aggregates of assets, activities and good will which comprise businesses for the purposes of certain other provisions of the Internal Revenue Code. Activities of producing or distributing goods or performing services from which a particular amount of gross income is derived do not lose identity as trade or business merely because they are carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. * * *

[4]One of the purposes of the UBTI tax was to do away with the competitive advantage enjoyed by tax-exempt organizations engaged in the operation of unrelated trades or businesses, as revealed by the following excerpt from the Senate Finance Committee report accompanying the 1950 legislation:

"The problem at which the tax on unrelated business income is directed is primarily that of unfair competition. The tax-free status of [sec. 501(c)] organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes. Also, a number of examples have arisen where these organizations have, in effect, used their tax exemptions to buy an ordinary business. That is, they have acquired the business with little or no investment on their own part and paid for it in installments out of subsequent earnings—a procedure which usually could not be followed if the business were taxable.

"In neither the House bill nor your committee's bill does this provision deny the exemption where the organizations are carrying on unrelated active business enterprises,

In response to a controversy over the application of section 1.513–1(b) to a situation in which a business was only a part of a larger endeavor related to an organization's exempt function, Congress enacted section 121(c) of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 542, which amended section 513(c) to provide further clarification of the trade or business concept embodied in section 513:

> (c) ADVERTISING, ETC., ACTIVITIES.—For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

Under this provision, any activity which is carried on for the production of income from the sale of goods or the performance of services constitutes a trade or business for purposes of the UBTI tax. Accordingly, respondent contends that petitioner's insurance-related activities constituted the performance of services for the production of income and thus, satisfy the trade or business requirement. Petitioner, on the other hand, maintains that its activities were limited and passive in nature and fell short of the level of activity which characterizes an ordinary trade or business. In addition, petitioner insists that its activities posed no threat of unfair competition, a factor which it believes to be a critical consideration in determining whether an unrelated trade or business exists. We agree with respondent.

At this juncture, a brief review of petitioner's insurance activities is useful. During the relevant years, petitioner endorsed or promoted to its membership several different group insurance programs underwritten by private insurance companies. The E & O malpractice insurance was underwritten by Utica Mutual and made available through the National

---

nor require that they dispose of such businesses. Both provisions merely impose the same tax on income derived from an unrelated trade or business *as is borne by their competitors.* * * * [S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 483, 504–505.]"

Association, a national organization of insurance agents whose membership was comprised of the members of the various State associations, including petitioner's members. In return for its endorsement of their product and other promotional efforts, the National Association received a fee in the form of a percentage of the premiums paid to Utica Mutual. Petitioner, in turn, received a share of these revenues (8 percent of the premiums paid by its members) to reflect its participation in the promotion of the program on a local basis.[5] Its efforts in this regard consisted of including descriptive brochures and rate schedules in the membership packets mailed to new and prospective members, promoting the insurance at educational seminars and in petitioner's official magazine, and answering telephone inquiries concerning the program.

The National Association also sponsored various group life and disability insurance programs underwritten by private insurance companies which petitioner helped promote during the years in issue. The services petitioner performed were similar to those provided in connection with the E & O program.[6] In exchange, petitioner received a fee from the National Association equal to 4 percent of the premiums paid by petitioner's members.

By contrast, the group health and life program underwritten by Independent Liberty was sponsored solely by petitioner without the involvement of the National Association. Petitioner performed a number of different administrative and promotional services in connection with this program, most of which

---

[5]Petitioner attempts to characterize the payments received from the National Association in connection with the E & O program as a form of revenue sharing, rather than as a quid pro quo for services rendered. We flatly reject this notion. We are convinced that the participation of the State associations in the promotional efforts was vital to the success of the program, and that the payments were compensatory in nature. Our conclusion is supported by evidence in the record which suggests that petitioner would have attempted to sponsor its own E & O program had the National Association decided to terminate the fee-splitting arrangement.

[6]Almost no evidence was adduced at trial concerning the nature of the services petitioner performed in connection with these particular programs. On brief, petitioner limited the scope of its argument to the E & O and Independent Liberty programs, and made no attempt to describe these services or to explain the purpose of the 4-percent service fee. Since petitioner's requested findings of fact suggest that these amounts are still in issue, we will not infer a concession on petitioner's part as to their taxable status. We will, however, proceed on the assumption that the promotional services rendered by petitioner were substantially the same as those rendered in connection with the E & O program.

were spelled out in an agreement between Independent Liberty and petitioner dated January 1, 1974. These services included stocking, and distributing to members, brochures and applications bearing petitioner's name and insignia, reviewing and forwarding applications and claims to the insurance company, disbursing claim drafts and certificates of coverage to members, acting as an intermediary or go-between in disputes between the members and the insurance company, and in general promoting and endorsing the plan as the official PIA plan.

Petitioner, relying principally on *Oklahoma Cattlemen's Association, Inc. v. United States*, 310 F. Supp. 320 (W.D. Okla. 1969), and *San Antonio District Dental Society v. United States*, 340 F. Supp. 11 (W.D. Tex. 1972), argues that these activities were primarily passive in nature and did not amount to a trade or business within the meaning of section 162. Thus, petitioner maintains that the general rule of section 1.513–1(b), Income Tax Regs. (which incorporates the trade or business concept of section 162), is inapplicable. In *Oklahoma Cattlemen's Association*, an organization exempt under section 501(c)(5) performed services substantially similar to those at issue here in connection with a master group health and life policy issued to it by an insurance company. In return for a percentage of the premiums paid by its members, the organization granted the carrier access to its membership files, described the insurance in a letter mailed to its members, permitted its name and insignia to be used in the insurance brochures, and forwarded correspondence from the members to the carrier. The District Court held that the premium rebates were not derived from a trade or business since the organization had no control over the financial results of its activities. The court distinguished what it considered to be passive involvement—the *endorsement* of insurance—from the active involvement associated with the actual *selling* of the insurance performed by the insurance company's agents. The former, it reasoned, could not be considered a trade or business within the generally accepted meaning of the term. Similar logic was applied in *San Antonio District Dental Society v. United States, supra*, regarding fees received by the society in return for its sponsorship of a bank payment plan made available to its members.

We disagree with the reasoning of these cases. Where a corporate taxpayer is involved, we think the determinative factor in resolving the trade or business issue is whether the activity was engaged in with the intent to earn a profit. See *International Trading Co. v. Commissioner*, 275 F.2d 578, 584 (7th Cir. 1960), affg. a Memorandum Opinion of this Court; *Smith v. Commissioner*, T.C. Memo. 1979–324. See generally 1 B. Bittker, Federal Taxation of Income, Estates, and Gifts, par. 20.1.2 (1981). If a profit motive is present, normally no further inquiry into the nature of the activity is required in order to determine whether the related expenses are deductible under section 162.

We think this requirement is clearly satisfied in the present case. To begin with, we note that petitioner's promotional activities were highly profitable and generated revenues far in excess of the related expenses. This does not come as much of a surprise, of course, since it is fairly obvious that petitioner was being compensated not so much for the administrative services it performed as it was for endorsing the insurance company's product and providing a direct pipeline to its membership. Thus, while the association stood to earn a great deal if participation in the group insurance programs became widespread, the downside risk was negligible or nonexistent. This makes it difficult for us to believe that petitioner entered into the promotional arrangements without a profit motive. Moreover, the record suggests that the fees were hardly an insignificant factor in deciding which program to sponsor. For example, Mr. Dale Bohm, who was the executive vice president of PIA during the years in issue, testified that if at any time the National Association had elected to discontinue its fee-splitting arrangement with petitioner on the E & O program, he would have recommended to the PIA board of directors that it drop the program entirely and look for an acceptable substitute to sponsor. We also note that for several years prior to the 1974 taxable year, petitioner's insurance activities were carried on by a nonexempt profit-making corporation (ASE), a wholly owned subsidiary of petitioner. These facts lead us to conclude that a profit motive was at least partially responsible for petitioner's decision to promote the programs.

Furthermore, we note that both *Oklahoma Cattlemen's Association* and *San Antonio District Dental Society* involved

taxable years which preceded the 1969 amendments to section 513. One of those amendments altered subsection (c) to state that any activity involving the performance of services for the production of income constitutes a trade or business for purposes of section 513. The statute does not, however, purport to draw a distinction between different *types* of services, and thus effectively overrules the active/passive dichotomy employed in the above cases.[7] We agree with the opinion of the District Court in *Louisiana Credit Union League v. United States*, 501 F. Supp. 934, 938 (E.D. La. 1980), which considered and rejected the reasoning of *Oklahoma Cattlemen's Association* on facts similar to those present here. Our conclusion is also supported by the decision in *Disabled American Veterans v. United States*, 227 Ct. Cl. ___ , 650 F.2d 1178, 1187–1188 (1981), where the Court of Claims held that the rental of an exempt organization's mailing list of donors to various direct mail advertisers constituted an unrelated trade or business, notwithstanding its predominantly passive nature. See also sec. 1.513–1(d)(4)(iv), example (*3*), Income Tax Regs. Accordingly, we conclude that petitioner's involvement in the promotion of group insurance constitutes the rendering of services for the production of income under section 513(c).

Petitioner further contends that a trade or business within the meaning of section 513(c) does not exist unless the activity poses a threat of unfair competition against taxpaying entities engaged in similar activities. Despite the fact that the statute itself contains no references to unfair competition, some courts have nevertheless held that it is a key consideration in determining whether an exempt organization is carrying on an unrelated trade or business. See, e.g., *Hope School v. United States*, 612 F.2d 298, 303–304 (7th Cir. 1980); *Disabled American Veterans v. United States, supra* at 1185–1187; see also *Clarence LaBelle Post No. 217 v. United States*, 580 F.2d 270, 275–281 (8th Cir. 1978) (Schatz, J., dissenting).[8] Other courts,

---

[7]Under sec. 512(b), certain types of passive investment income are excluded from the computation of UBTI, such as dividends, interest, royalties, and real property rents. However, petitioner does not contend that the promotional fees fall within any of these exclusions.

[8]The cited authorities rely principally on the legislative history of the UBTI provisions, including the 1978 amendments which legislatively overruled the result reached in *Clarence*

including this one, have stated that unfair competition plays either a relatively minor role in the application of the UBTI tax (see *Clarence LaBelle Post No. 217 v. United States, supra* at 272–274; *Smith-Dodd Businessman's Assn., Inc. v. Commissioner,* 65 T.C. 620, 624 (1975)), or no role at all (see *Louisiana Credit Union League v. United States, supra* at 938–939). While creditable arguments can be made on both sides of this issue, we do not find it necessary to reassess our position in *Smith-Dodd.* Even if we were to assume that some degree of unfair competition, or at least the threat thereof, is necessary in order to justify imposition of the tax, petitioner has, in our judgment, failed to prove that its sponsorship of the group insurance programs did not or could not place it in a competitive situation with other taxpayers. As we see it, the business which petitioner was engaged in was the business of promoting the group policies of certain insurance companies to its members. Although it never actually sold any insurance, its activities were similar to those of an insurance agent in the sense that its services helped create a market for the insurance. Presumably there were other taxpayers involved in the selling or marketing of group insurance plans who might have been interested in promoting their product to petitioner's members. In fact, the evidence indicates that several other multiple-employer associations or trusts in Michigan sponsored group insurance plans, including petitioner's competitor, Independent Insurance Agents of Michigan. It is not unreasonable to assume that these organizations[9] would have welcomed the participation of petitioner's membership in their plans. Granted, petitioner was in a superior position to exploit its own membership list, not only because of its direct access to the members but also because of its position as a trusted and responsible representative of their interests. Presumably, this would make its endorsement a uniquely valuable commodity from the standpoint of an insurance company, and it is conceivable that any competitive advantage enjoyed by petitioner would have been largely attributable to the special

---

*LaBelle Post* and *Smith-Dodd Businessman's Assn., Inc. v. Commissioner,* 65 T.C. 620 (1975), as well as certain provisions of the regulations which arguably incorporate an unfair competition test. See, e.g., secs. 1.513–1(b) and 1.513–1(c)(1), Income Tax Regs.

[9]The record does not indicate whether these entities were also tax exempt.

relationship it shared with its members, rather than to its status as a tax-exempt organization.[10] Be that as it may, we do not feel free to rest our decision in this case on what amounts to sheer speculation on our part concerning the nature and extent of the competitive environment in which petitioner operated. Petitioner has simply failed to produce sufficient evidence to carry its burden on this issue. Accordingly, we hold that petitioner's insurance activities constituted a trade or business activity for purposes of section 513.

## B. Regularly Carried On

The second requirement which must be met in order to impose the UBTI tax is that the trade or business be "regularly carried on." Petitioner has made no argument to the effect that its insurance activities were not regularly carried on, nor do we think any such argument would be convincing in view of the ongoing and continuous nature of its promotional efforts. We hold, therefore, that petitioner's trade or business was regularly carried on within the meaning of sections 1.513–1(a) and 1.513–1(c), Income Tax Regs.

## C. Not Substantially Related

The third and final requirement for the imposition of the tax is that the trade or business must not be substantially related to the exempt purpose or function of the organization. Section 1.513–1(d)(2), Income Tax Regs., elaborates on the meaning of "substantially related" in the following terms:

(2) *Type of relationship required.* Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business

---

[10]We note that the Court of Claims recently held that a sec. 501(c)(4) organization which rented out a mailing list of its donors to various tax-exempt and commercial organizations in order to earn additional revenue was engaged in a competitive trade or business for purposes of sec. 513. See *Disabled American Veterans v. United States*, 227 Ct. Cl. ___ , 650 F.2d 1178, 1187–1188 (1981). Although the court conceded that "mailing lists are each unique such that it cannot be said that any one list competes against any other list for rental income," it nevertheless held that the activity was carried on in a competitive manner because the taxpayer followed the established trade practices of the direct mail industry in determining the rates to be charged.

It would appear that under the test adopted by the Court of Claims, the requirement of unfair competition would be satisfied merely upon a showing that the activity was carried on in a commercial manner, without necessarily having to establish the existence of head-to-head competition with another taxpayer.

activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. * * *

Thus, for petitioner's insurance activities to escape taxation, they must contribute directly and importantly to the accomplishment of one or more of its exempt purposes.

According to section 1.501(c)(6)–1, Income Tax Regs., an exempt business league is "an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit." To this end, petitioner's articles of incorporation provide that its general function is:

to maintain and extend the American Agency System, which system is defined to be the production of insurance premiums and service of insurance contracts by insurance agents operating solely on a commission basis on their own account as independent contractors, owning their own expirations and who maintain their own offices separate from any insurance company. * * *

We must determine, then, whether petitioner's insurance activities contributed importantly to the advancement of the common business interests of independent insurance agents.

Other courts have considered the "substantially related" issue in similar contexts with conflicting results. In *Oklahoma Cattlemen's Association, Inc. v. United States, supra* at 323, where the challenged activities were in all material respects the same as those at issue here, the District Court held that a substantial relationship existed because the members of the organization were self-employed individuals with no other opportunity to participate in group insurance programs. Similarly, in *San Antonio District Dental Society v. United States, supra* at 15, the District Court concluded that the taxpayer's efforts directed at "making a payment plan [to help patients finance their dental bills] available to the dental society membership on reasonable terms where none was previously available" were substantially related to its exempt

purposes. More recently, however, the District Court in *Louisiana Credit Union League v. United States, supra* at 940–941, decided that the League's endorsement of group insurance plans was principally motivated by a desire to raise revenue, and at best was only "tangentially related" to the furtherance of the credit union movement. Consequently, the court found the necessary substantial relationship lacking.

We agree with the reasoning expressed in *Louisiana Credit Union League.* One of the requirements which a business league must satisfy in order to qualify for exemption is that its activities must be directed toward the improvement of business conditions of one or more lines of business as opposed to the performance of particular services for individual persons. See *National Muffler Dealers Assn. v. United States*, 440 U.S. 472 (1979); sec. 1.501(c)(6)–1, Income Tax Regs. In *Associated Barbers & Beauticians v. Commissioner*, 69 T.C. 53, 69–70 (1977), this Court held that this requirement was not met where a trade association offered its membership a variety of insurance programs, some self-insured and others underwritten by private insurance companies, and in addition provided other benefits such as selling textbooks and supplies to members. We concluded that these activities, which formed the bulk of the activities performed by the taxpayer, did not contribute to the improvement of business conditions in the hairstyling profession, but rather constituted the performance of "particular services" because they served as a convenience or economy to the individual members. Consequently, we denied the taxpayer's exemption.

A careful reading of that opinion makes it clear that some of the "particular services" rendered by the association were identical to those at issue here, i.e., services aimed at improving the availability of certain group insurance programs to members. Logically, if such activities do not contribute to the improvement of business conditions in the context of determining whether an organization qualifies for exemption, then surely these same activities cannot be said to be related to the organization's exempt purpose in the context of the UBTI provisions.

We have no quarrel with petitioner's assertion that participating members were benefited by the group insurance programs, for the evidence clearly shows that to be the case.

However, that fact alone does not establish "relatedness" insofar as a business league is concerned; rather, the burden is on the taxpayer to show that the challenged activities contributed directly and importantly to the improvement of conditions in a particular line of business. On this record, we conclude that petitioner's insurance activities did little more than generate revenue for the association and provide members with a convenient and economical service in the operation of their agencies. As such, they stand in sharp contrast to petitioner's educational and legislative activities, which served the broader purpose of improving the general business environment in which insurance agents operated. We hold, therefore, that petitioner's trade or business of promoting insurance was not substantially related to its exempt purpose.

To summarize, we hold that the income from petitioner's insurance activities was derived from a regularly carried on trade or business bearing no substantial relation to petitioner's exempt function. Accordingly, such income, less allowable deductions, is subject to the tax imposed by section 511(a).

## Issue 2. Experience Rating Reserve Refund

We next address the taxable treatment of the $43,227.76 experience rating reserve (ERR) refund received by petitioner upon termination of the group health and life policy underwritten by Time Insurance. Petitioner terminated this policy effective January 1, 1974, and replaced it with the Independent Liberty program. The Time Insurance policy had an experience rating reserve clause which provided for regular contributions to a reserve account equal to a specified percentage of the gross premiums received by the insurance company. This reserve was intended to provide a buffer in the event the company experienced larger-than-anticipated losses. In March 1975, more than a year after termination of the policy, Time Insurance refunded the balance of the reserve to petitioner, subject to an agreement whereby petitioner agreed to remain liable for any delinquent claims which might be filed against the insurance company at some later date.

Since this refund was directly attributable to petitioner's group insurance activities, we conclude it must be characterized as unrelated business income along with the promotional fees. However, petitioner maintains that the refund was not

"income" to the association because it received the refund in trust for its members and exercised only ministerial control over the funds during the taxable years in issue. The trust imposed on the funds allegedly arose under the terms of the March 1975 agreement with Time Insurance, which provided that (1) the distribution of the funds to members was the "sole obligation" of petitioner, and (2) petitioner would remain liable to Time Insurance to the extent of the amount of the refund for any additional claims which might be filed on the terminated policy.

Unlike petitioner, we do not view this agreement as imposing any trust, either actual or constructive, on behalf of its members. The agreement merely absolves Time Insurance from any responsibility with regard to the ultimate disposition of the refund, and does not create any legal duty on the part of petitioner to distribute the funds to its members. Moreover, petitioner's handling of the refund belies the existence of any fiduciary relationship. It did not segregate or otherwise earmark the funds to indicate that they were being held in trust. Instead, it simply deposited the refund check in its general checking account and enjoyed full use and control of the funds thereafter. More importantly, petitioner has never made any attempt to distribute the funds to its members. Under these circumstances, we cannot conclude that it held the funds in trust for their benefit.[11]

The fact that petitioner was under a contingent obligation to reimburse Time Insurance in the event any additional claims were filed on the policy is of little consequence. It appears that the possibility of any substantial claims arising was remote at best; a Time Insurance executive testified that normally 98 to 99 percent of all claims would have been filed before the expiration of the 1-year claim-lag period which preceded the refund. As it turned out, there were no new claims and

---

[11]In support of its argument, petitioner relies on our opinion in *New York State Assn. of Real Estate Boards Group Insurance Fund v. Commissioner*, 54 T.C. 1325 (1970), where we held that retroactive rate credits received by a nonexempt insurance trust were not income to the trust. However, the trust agreement in that case provided that all moneys received by the taxpayer were either to be held in trust for the payment of insurance premiums for the members' benefit or to be returned to the members as premium refunds. By contrast, there is no trust agreement in the instant case and the petitioner was free to do as it pleased with the refund. Other cases cited by petitioner are similarly distinguishable.

petitioner's contingent liability never materialized. In any case, it is well settled that amounts received under a claim of right, without restriction as to their disposition, are taxable when received, notwithstanding that the taxpayer may be under a contingent obligation to restore the funds at some future point. See *North American Oil Consolidated v. Burnet*, 286 U.S. 417 (1932); *Hope v. Commissioner*, 55 T.C. 1020 (1970), affd. 471 F.2d 738 (3d Cir. 1973); *Latimer v. Commissioner*, 55 T.C. 515 (1970). Accordingly, we hold that the ERR refund constituted income taxable to petitioner in the year of receipt.

To give effect to concessions and our conclusions on the disputed issues,

*Decision will be entered under Rule 155.*